## UNDERWOOD TYPEWRITER CO. v. FOX TYPEWRITER CO.

### (Circuit Court, W. D. Michigan, S. D. November 1, 1909.)

1. PATENTS (§ 327*)—SUIT FOR INFRINGEMENT—EFFECT OF PRIOR ADJUDICATIONS.

   Where the questions involved in determining the validity of a patent are fairly doubtful, the decision of one Circuit Court of Appeals sustaining the patent should be followed in another circuit if the record is substantially the same, although a court would have no right to abdicate its own judgment.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 622; Dec. Dig. § 327;* Courts, Cent. Dig. § 328.]

2. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — TABULATING ATTACHMENT FOR TYPEWRITERS.

   The Gathright patent, No. 436,916, for a tabulating attachment for typewriting machines, was not anticipated, and, while not for a pioneer invention, covers a primary improvement, and the claims are entitled to a liberal construction and a fairly broad range of equivalents. Claims 4 and 5 also *held* infringed.

3. PATENTS (§ 328*)—CONSTRUCTION AND INFRINGEMENT—TABULATING ATTACHMENT FOR TYPEWRITERS.

   The Gathright patent, No. 452,268, for a tabulating attachment for typewriting machines, which covers specific improvements on the patentee's prior patent No. 436,916, construed, and *held* not infringed.

In Equity. Suit by the Underwood Typewriter Company against the Fox Typewriter Company. On final hearing. Decree for complainant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Briesen & Knauth, for complainant.
Chappell & Earl, for defendant.

KNAPPEN, District Judge. This suit is brought on account of the alleged infringement of two United States patents granted to Josiah B. Gathright on tabulating devices for typewriting machines. The numbers and dates of the patents are, respectively, 436,916, September 23, 1890, and 452,268, May 12, 1891. These patents will hereafter be referred to, respectively, as the first and second Gathright patents. In the early history of the typewriting art, in order to bring words and figures into accurate vertical columns, as required in invoices, statements of account, and other work of that kind, it was necessary to advance the carriage to the columnating point one space at a time by repeatedly striking the usual spacing key or by unlatching the carriage and sliding it to the desired point by hand.

The specifications of the first Gathright patent, after reciting this early history of the typewriting art and stating that such processes were tedious and perplexing to the operator, and that the object of the invention "is to obviate these objections by providing means for automatically locating with the typewriter one or more columns of words or figures and of mechanically skipping any intervening space desired to be left blank," describe the tabulating mechanism as embracing a "supplemental spacing key," so called, and the use of a stop entirely distinct from the spacing mechanism, adapted to engage with the carriage. By the words "supplemental spacing key" the inventor says he means a key exclusively devoted to the duty of, first, disengaging the carriage rack from the detent and holding it disengaged until the carriage, traveling its usual path, has passed over the space which it is desirable to skip "to a stop whose location is adjustable and was predetermined to fit said skipped space; and, second, to remove the said stop by the act of releasing the said spacing key, thus permitting the carriage to resume service at the usual letter spaces." Of this supplemental skipping key the inventor further says that:

"It has only one service to perform. When it is pressed down in operation, it releases the carriage detent and places an adjusted stop in the path of the carriage to arrest it at the desired point. On permitting the supplemental spacing key to rise, it withdraws the stop from the path of the carriage, leaving it free to resume work, as usual."

This supplemental spacing key the inventor contrasts with keys which allow the carriage to advance but one letter space at a time, also with the common hand lever, whereby the carriage may be raised from its usual path and carried over any number of letter spaces; also, with any key adapted by light pressure to advance the carriage a single letter space and by a heavier pressure to entirely release the carriage, so that it may travel over a number of letter spaces to a stop. The tabulating attachment was entirely independent of the spacing and feeding mechanism, and was designed by the inventor to be attached to or removed from a machine without interfering with its use as a writing machine; the specifications saying:

"It would require only ordinary mechanical skill to adapt my stop rod and lugs to any kind of a self-feeding typewriting machine by following out the

principle of construction herein described. Therefore, I deem it unnecessary to illustrate its application to the great variety of typewriting machines which have been invented."

The claims of the first Gathright patent which are involved here are the fourth and fifth, which are as follows:

"4. The combination of a stop rod freely hung to the machine, a stop lug thereon, and a supplemental spacing key hung in the machine and adapted to move the said stop lug into the path of a portion of the feed carriage, and connection between the stop rod and rack bar, substantially as shown and described.

"5. In a typewriter, the combination of the usual letter keys and one or more spacing keys having mechanism in common for permitting the carriage to move a definite space at each stroke, and a supplemental spacing or skipping key fitted to permit the carriage to move any desired number of said spaces, according to adjustment, said key provided with independent mechanism for releasing the carriage from the detent, and mechanism for simultaneously interposing an adjustable stop, substantially as shown and described."

In the case of Wagner Typewriter Co. v. Wyckoff, Seamans & Benedict, 151 Fed. 585, 81 C. C. A. 129 (hereafter called "the original case"), which was decided January 8, 1907, the Circuit Court of Appeals of the Second Circuit considered and construed both Gathright patents. It was there held that long previous to Gathright's first invention Schulte, McCormack, Yost, and others had conceived the broad idea of an automatic tabulating attachment, and had described operative mechanism for carrying it out, but that all the inventors prior to Gathright used the feed dog to contact with and stop the carriage, that the principal features of Gathright's first invention are, first, a supplemental spacing key exclusively devoted to the tabulating attachment and performing no function except in connection therewith; and, second, a lift slide and stop rod freely hung, adjustable longitudinally of the machine, and normally supported close beneath some cross-portion like the lateral arm of the feed rack. In the case of American Writing Mach. Co. v. Wagner Typewriter Co., decided at the same time with the "original case" (151 Fed. 576, 81 C. C. A. 120), the early history of the tabulating art is given.

In Gathright's invention pressure on the supplemental spacing key disengages the rack from the feed dog by raising the rack and holding it disengaged until the carriage passes over the desired space, when it is stopped by the lateral arm of the feed bar coming into contact with lugs adjustably, but firmly fixed to the stop rod, the raising of the rack from the feed dog being directly effected by the raising of the stop rod, which itself lifts the feed rack by raising the lateral arm thereof designed to contact with the lugs on the stop rod. When pressure on the key is released, the stop rod returns to its normal position, the lugs are removed from the path of the carriage, the feed rack lowered into engagement with the feed dog, and the machine is free to resume its step by step action. It was held by the Court of Appeals in the original case that Gathright's contribution to the art consists in "providing an independent mechanism, operated by a separate spacing key, by which adjustable stop lugs can be brought into contact with a portion of the feed carriage, thus dispensing with the use of the small

and comparatively delicate feed dog or detent to bear the greatly increased strain when the carriage is released from the step by step movement." The first Gathright patent was held to be valid, and, although not a pioneer invention, was held to cover a primary and valuable improvement on the tabulators of the prior art and to be the first practically and commercially successful tabulating device; and its claims thus entitled to a construction sufficiently liberal, and a range of equivalents sufficiently broad, to protect the actual invention. The Gorin tabulator which was there involved was held to infringe the first Gathright patent.

Under well-settled principles of comity and in the interest of uniformity of decision, this court should follow the decision of the Circuit Court of Appeals sustaining and construing the Gathright patent, except so far as new defenses or new features are presented here, or unless this court should be satisfied that the prior decision referred to is erroneous. In other words, when the questions are fairly doubtful, the prior decision should be followed, if upon substantially the same record, although this court has no right to abdicate its own judgment, or to surrender its own clear convictions. Pratt v. Wright (C. C.) 65 Fed. 99; Mast-Foos v. Stover, 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856; Con. Rubber Co. v. Firestone Tire & Rubber Co., 151 Fed. 237, 80 C. C. A. 589; Expanded Metal Co. v. Gen. Fireproofing Co., 164 Fed. 849, 850, 90 C. C. A. 611. Upon the question of the validity of the first Gathright patent (independently of the question of the degree of liberality with which the patent should be construed as against alleged infringement), it is earnestly contended by defendant that the prior decision is wrong upon the record then presented, and that the patent in question is clearly shown to have been anticipated by other references, either not before or not considered by the court in the original case.

The proposition that the decision in the original case as to the validity of the patent is erroneous upon the record there presented is largely based upon the proposition that the Schulte patent, which was directly considered in the original case, actually anticipated the first Gathright patent. It seems clear that the Schulte patent did not anticipate the Gathright patent, as that patent is construed by the Court of Appeals. The Schulte device differed radically from the Gathright invention in three important particulars: First, the feed dog came into engagement with the stop; second, this stop was positioned not automatically, but mechanically, by hand; and, third, the skipping key was not, in a proper sense, supplemental and independent of the spacing mechanism. In throwing the dog out of engagement with the feed rack, and into the path of the stop bar, the skipping key acted directly upon the mechanism connected with the universal bar, and, while in a sense supplemental, was so connected as by a light pressure to advance the carriage a single letter space at a time, and by a heavier pressure to travel over a number of spaces (a type of key from which Gathright expressly distinguished his invention), although in actual practice the inventor, and probably operators, preferred using the skipping key for skipping or tabulating work only.

The other patents relied upon here as anticipating the Gathright in-

vention and either not presented to, or not referred to by the court in the original case are British patent to Raggett, No. 1864, May 16, 1880, United States patent to Murphy, No. 324,407, August 18, 1885, and the Standard British patent, No. 7269, May 16, 1888. In my opinion, it is not fairly apparent that either or all of the patents last referred to, if considered by the court in the original case, would naturally have led that court to a different conclusion. The Murphy patent, however, was in fact presented as an anticipation, although not referred to in the court's opinion. It provides a mechanism by which, when the carriage (which is actuated in its forward movement by means of pawl and ratchet, in connection with rack and pinion, but against the tension of the spring) has reached the end of its journey, the escapement is released by means of a lever, and the carriage propelled in the reverse direction by the tension of the spring until it comes into contact with an adjustable marginal stop which defines the commencement of the printed line. It is true that by the device referred to the feed dogs are entirely relieved of shock when the carriage is arrested by the marginal stop in its reverse movement. It is also true that the device employs an independent and supplemental skipping key, whose only office is to release the escapement mechanism, and allow the carriage to return to the point of commencement. It is also true that the release of the escapement mechanism is effected in much the same manner as is that of the defendant here, viz., not by separating the rack from the pinion, but by releasing the detent from the ratchet and allowing the pinion to spin when the reverse movement is going on. But these features give the device no close relation to the skipping device of the Gathright patent. Murphy's patent does not, and cannot, employ a lever whose function is to release the escapement, and at the same time interpose a stop in the path of the carriage. The invention has no relation to a tabulating device. The "skipping" is backward, and not forward. The releasing mechanism is not adapted to use in connection with a tabulating device, for the reason that the carriage, being operated against the tension of the spring, can be so operated only by an actual use, as distinguished from a skipping, of the escapement mechanism.

The language in the specifications of the Raggett patent, which is especially relied upon to show anticipation, is this:

"I also provide a device for regulating the spaces in b, s, and d, and yds., ft. and in. This device may consist of an adjustable stop as shown in side view in fig. 46 or of a series of adjustable arms attached to a spindle, which arms stop the paper carriage in the required position."

The alleged anticipation under this patent is, to say the least, vague and unsatisfactory. Column or tabulating stops are nowhere mentioned. It is conceded that the patent does not specifically describe a mechanism consisting of a supplemental spacing key by which the carriage detent is released and an adjustable stop placed in the path of the carriage to arrest it at the desired point. Nor is the disclosure made by the specifications and drawings sufficient to clearly show the elements contained in the claims of the Gathright patent here involved. The most which can be said for the Raggett disclosure is that

the inventor may have had in mind a device of the nature of that shown by Gathright.. If he did, however, have that device in mind, he failed to show it clearly enough to enable those skilled in the art to understand the nature and operation of the invention and to carry it into practical use. It must therefore be disregarded as an anticipation of Gathright.

The Standard patent provides a mechanism for changing the limit of travel of the carriage by interposing one or the other of two stop blocks (attached to an adjustable but rigidly hung bar) in the path of a stop projecting from a given rod. The inventor says of this feature:

"This arrangement is very convenient when extracts or quotations are to be introduced, or shortening of the lines, serving to distinguish one clause or matter from another. It is also of considerable advantage in tabulating or other work, where part of the matter is to be set at one side of a given line, and part at the other side."

The Standard invention provides a hand lever by which in the process of drawing the carriage back to the starting point the dogs are lifted clear of the rack and the friction from dragging the dog over the teeth of the rack bar is avoided. By use of this lever the escapement may be disengaged during the travel of the carriage to the point of engagement between the stop block and a given stop on the guide rod. Such lever is expressly distinguished by the Gathright patent specifications from the Gathright invention. It has no supplemental skipping key for disengaging the rack and detent, no key mechansim for interposing a stop lug in the path of the carriage, and no stop rod freely hung. The record indicates that the Murphy device was never manufactured, and that the Raggett devices could not, by reason of their inefficiency, be marketed. It does not appear that any tabulating device under the Standard patent was ever used, commercially at least. The tabulating devices of Schulte, Yost, or McCormack never came into anything like general use. Comparatively few only of the devices under either of these three patents were ever marketed or used.

I entirely agree with the decision of the Court of Appeals in the original case in holding the first Gathright patent valid. The question whether defendant's structures infringe this patent depends upon the degree of liberality with which the Gathright patent is construed. In the original case it was held by the Court of Appeals that "to Gathright belongs the credit of constructing the first commercially successful tabulator"; the court saying:

"The changes introduced by him seem simple and obvious in the light of the present, but it is a significant fact that all the prior inventors, Schulte, McCormack, and Yost, used the feed dog to stop the carriage, and it never seems to have occurred to any one before Gathright to make a tabulating apparatus wholly independent of the writing machine proper. Gathright's device, though an improvement upon the existing tabulators, was an improvement of such vital importance that it may be said that the art, when considered from a practical and commercial point of view, began with him. He converted a theory into a fact. His invention belongs to that large class which have ever been treated with liberality by the courts, where the inventor, by an apparently simple change, addition or transposition of parts has converted imperfection into completeness."

It accordingly held that Gathright's improvement was a primary one, and so was entitled to a liberal construction. The defendant here contends that this conclusion was reached in the original case under a misapprehension that tabulators prior to Gathright's invention "were not commercially successful, and never could be made successful so long as the feed dog was utilized to receive the entire shock of the spring propelled carriage," and under the mistaken view that the evidence presented in the original case showed that in the operation of the earlier tabulators the feed dog was "battered and worn beyond the help of the repairer." Defendant has accordingly introduced testimony of experiments made in the use of the feed dog as a stop, indicating that the feed dog, especially if artificially strengthened or if relieved from the full force of the blow by means of a brake, is fully able to stand without serious injury the shock of natural use as a tabulator stop during the lifetime of a writing machine.

But the court in the original case seems not to have attributed the commercial failure of tabulators prior to Gathright's solely to the inability of the feed dog to withstand use as a tabulator stop, but to have included in such causes the fact that prior devices did not operate independently of the writing machine proper, and, in general, the lack of the special features of the combination devised by Gathright. However, it seems obvious, notwithstanding the experiments introduced by defendant, that the use of the feed dog as a stop is, in the nature of things, undesirable. It is manifest that, if so used, great care must be taken in ensuring the proper degree of hardness and strength, with liability to injury or breakage in case of any failure in accuracy of construction; and that this, in the case of a construction so delicate as the feed dog, is of necessity attended with difficulty. Moreover, operated as it was in the Schulte, Yost, and McCormack devices, in connection with the spacing mechanism, it would seem that its use as a tabulator stop would be likely to interfere with the accuracy and alignment of the spacing mechanism. But whatever weight may be attached to the undesirability of the use of the feed dog by reason of its so-called delicacy, the fact remains that since Gathright's invention no tabulator has been used with commercial success which did not involve the principle of his invention, viz., a tabulating apparatus entirely independent of the writing machine proper, and embracing a stop rod freely hung and an independent spacing key, devoted exclusively to the duty of disengaging the carriage from the detent and interposing in the path of the carriage a stop wholly independent from the spacing mechanism, and, in turn, removing the stop from the carriage path and renewing the engagement between the rack and the detent. The correctness of the conclusion of the Court of Appeals that Gathright's invention turned what was before unsuccessful into a complete and lasting success is not successfully assailed. I am satisfied to adopt the conclusion of the Court of Appeals in the original case that Gathright's improvement is a primary one, that the claim should be construed as broadly as the invention, and that his claims are thus entitled to a liberal construction, and that, under this construction, infringement is not limited to the employment of the precise means adopted by Gathright, but extends to equivalents of the elements of his combination which per-

form substantially the same function in substantially the same way to obtain the same result. Smead v. Fuller & Warren Co., 57 Fed. 626, 6 C. C. A. 481; Electric Controller & Supply Co. v. Westinghouse Elec. & Manf'g Co., 171 Fed. 83, 96 C. C. A. 187; Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Consolidated Valve Co. v. Crosby Valve Co., 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939; Barbed Wire Patent, 143 U S. 275, 282, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Westinghouse v. Boyden Co., 170 U. S. 537, 572, 18 Sup. Ct. 707, 42 L. Ed. 1136; Hobbs v. Beach, 180 U. S. 383, 392, 21 Sup. Ct. 409, 45 L. Ed. 586.

As to the question of infringement. In complainant's machine which was before the Circuit Court of Appeals in the original case, no sprocket wheel is employed in the feed mechanism, and the supplemental key directly rocks a shaft in the rear of the machine and substantially in the plane of the escapement mechanism. By the rocking of the lower arm of this shaft a projection therefrom bears upon a projection from the dog, thus depressing the latter and releasing it from the rack, instead of raising the rack from the dog as in the description of the Gathright patent. By the rocking movement of the shaft a stop block upon an upper arm is thrown into the path of a projection on the carriage.

In "Complainant's Typewriting Machine" presented here, the feed mechanism employs a sprocket wheel with rack and pinion; the dog thus not engaging the rack. The supplemental skipping key directly rocks the shaft. By this rocking movement a projection from the lower arm of the rock shaft depresses one end of a pivoted lever, whereby the other end of the lever directly raises the rack from the pinion and disengages the escapement. By this same rocking movement a stop block on the upper rod of the rock shaft is interposed in the path of a block on the carriage.

The Gorin tabulator, which was held in the original case to infringe the first Gathright patent, was attached to a Remington typewriter which employed the rack and pinion escapement. In the operation of the tabulating device, a supplemental skipping key acted by its lever upon one of a series of several flat stops vertically hung in the rear of the machine, throwing it forward. By this forward movement an abutment upon the bar, and at right angles thereto, engages directly with a pivoted lever mechanism whereby the outer end of a connecting lever raises the rack from the pinion.

In both of defendant's alleged infringing machines the step by step mechanism is accomplished by rocking the dogs in and out of engagement with the sprocket wheel, which, in turn, operates the rack and pinion escapement. In defendant's "single key tabulator," by pushing a supplemental spacing key a rod in the back part of the machine, and at right angles with an arm of the spacing key, is made to rock forward by means of a transverse arm rigidly attached to the shaft, and by the rocking of the latter an upright stop rod is moved upwards and into the path of the carriage. Another transverse arm rigidly attached to the shaft (but extending in the opposite direction) by the same movement of the shaft removes the dogs from the path of the sprocket wheel, thus allowing the carriage to move, under the tension of the

spring, with the rack and pinion still in engagement. The mechanism of "defendant's decimal tabulator" differs from that of the single key tabulator in this: It is provided with a series of 10 skipping keys, each attached to a plunger rod which operates to raise to a greater or less height one of three flat stop bars at the rear of the carriage, two of these rods having four, and the third two, shoulders cut in the upper end thereof, so as to provide ten separate abutments as stops. The push buttons connected with these skipping keys protrude through a fretboard or cross-bar at the front of the machine. This cross-bar is connected at each end with a rod, constituting a lever arm operating directly to remove the detent from the path of the sprocket wheel. If the push buttons at the ends of the skipping keys were pressed through the fretboard, but without disturbing the latter, the only effect would be to raise the corresponding stop in the path of the carriage, without releasing the escapement. But the push buttons on the skipping keys are smaller than the end of a normally sized adult finger, and the pressing of the finger upon the button of the skipping key, in the usual manner, carries with it the fretboard, thus releasing the escapement simultaneously with the interposition of the stop in the path of the carriage. But for the locking mechanism hereafter mentioned, pressure upon the fretboard, except in conjunction with pressure upon the skipping key, would have no effect whatever upon the tabulating mechanism by way of interposing the stop. The two operations may thus be mechanically distinct and independent, although in practice they are accomplished conjointly by finger pressure upon the push button through pressure upon the fretboard. In order, however, to prevent an accidental release of the spacing mechanism in advance of the interposition of the stop through pressure upon the fretboard, a locking mechanism is applied which makes it impossible to release the escapement mechanism except in conjunction with the interposition of the stop. This mechanism consists of a swinging plate extending across the machine over the inner ends of the rods operating the stop mechanism, to which are attached the push buttons. The ends of this plate engage collars upon the rods connecting with the fretboard, thus preventing the movement of the rods operating the lever escapement mechanism. The lower edge of this plate is so curved as to be acted upon by conical buttons mounted upon each of the rods operating the stop mechanism, with the result that, when the push button is pressed, the plate is raised from engagement with the collars on the rods operating the escapement mechanism, and the two operations of releasing that mechanism and interposing the stop are necessarily accomplished simultaneously and conjointly.

It is evident that, if infringement is to be tested by absolute identity of means employed, neither of defendant's machines infringe. But, tested by the principles applicable to primary inventions, it seems clear that defendant's single stop tabulator infringes the first Gathright patent. With respect to claim 4: It has first a stop rod (to wit, the so-called stop bar) freely hung to the machine; second, the equivalent of a stop lug on the rod, to wit, a series of adjustable stops upon the carriage with which the end of the stop rod engages (as pointed out in the original case, it is a mere matter of convenience whether the

adjustable lug is on the stop rod or on the carriage); third, a supplemental spacing key, hung in the machine and adapted to move the stop into the path of the lug on the feed carriage; and, fourth, connection between the stop rod and rack bar by means of the rock shaft. The escapement is released and the stop interposed by one movement of a single independent spacing key. The connection between the stop rod and rack bar is thus direct and immediate, unless such connection is avoided by the fact that the release of the escapement mechanism is effected by removing the detent from a sprocket to which the pinion is attached and of which it is made part, rather than by raising the rack from the pinion or lowering the pinion from the rack. ' In my opinion the method of feed and resulting method of release does not alter the fact of connection between the stop rod and rack bar.

As to the fifth claim: Defendant's single-stop machine has, first, the usual letter keys and spacing keys, with mechanism in common for the step by step movement; second, the supplemental spacing or skipping key fitted to permit the carriage to move any desired number of spaces according to adjustment; third, said key provided with independent mechanism for releasing the carriage from the detent; and, fourth, mechanism for simultaneously interposing an adjustable stop. It seems clear that defendant's decimal tabulator also infringes claim 4 of the first Gathright patent, unless such infringement is avoided either by the fact that a series of stop rods and a series of abutments thereon is employed instead of a single rod, or because of lack of direct connection between the stop rod and rack bar, or the fact that the skipping key does not operate the stop-interposing mechanism.

With respect to the employment of a series of stop rods, it is, to my mind, correctly held in the original case that the question of infringement must be considered from the viewpoint of a single key, and that, if one key and its train of mechanism infringes, it is sufficient.

The question whether there is in this tabulator the requisite unity of stop-interposing and escapement-release mechanism, and thus the requisite connection between the stop rod and rack bar, is a question of more difficulty. Were it not for the use of the locking mechanism before referred to, I have doubts whether, in view of the independence of construction between the escapement-releasing and the stop-interposing mechanism, and the fact of their capability of operation independently of each other, these two mechanisms can properly be considered as the equivalent of the Gathright spacing key, which alone performs the two functions of escapement release and stop interposition. My mind is, however, strongly inclined to the view that by reason of the employment of the locking mechanism mentioned, and the conjoint use of the feed-releasing and stop-interposing mechanism thereby accomplished, the equivalent of the Gathright supplemental spacing key is found and the required connection between the stop rod and rack bar created. Judge Lacombe, who participated in the decision of the original case, held on application for preliminary injunction in the case of Underwood Typewriter Company v. Fox Typewriter Company, Ltd. (pending in the Circuit Court for the Southern District of New York), that both defendant's tabulating machines infringe the first Gathright patent. This decision, which is entitled to high consid-

eration, is of greater interest from the fact that the issues as to validity and infringement are the same in the two cases; the testimony taken being applicable on final hearing to both. This conclusion as to the infringement of claim 4 leads to a like conclusion in the case of claim 5.

As to the second Gathright patent: The claims here involved are numbers 6 and 8, as follows:

"6. The combination, in a typewriting machine having a carriage feed rack, of a detent hung to engage the said rack, a rock shaft journaled in bearings parallel with the feed rack to be rocked in a direction transverse thereto and having one arm communicating with the said detent to disengage it from the rack and another arm or block to be rocked into the path of a fixture of the carriage, and a skipping key connected with the rock shaft, substantially as described."

"8. The combination of a typewriting machine feed rack, a rock shaft nearly parallel with the rack wholly independent of the ordinary feed rock shaft, a lug upon one and stop blocks adjustably secured upon the other, a detent for the rack, the rock shaft having one arm to disengage the rack and detent, and another arm connected with a skipping key, substantially as described."

The distinguishing feature of this patent is the substitution of a rock shaft for the stop rod of the former patent. Without reference to the other considerations hereafter mentioned, it is evident that defendant's decimal tabulator does not infringe the second Gathright patent, for the reason that the stop is not rocked by a shaft into the path of the carriage, the movement being effected by a lever, the shaft being employed only as a pivot rod. But to my mind the second Gathright patent (passing the question of its validity as involving invention) is not infringed by either of defendant's structures. The later patent relates exclusively to specific improvements upon the processes of the earlier patent for the purpose of "adapting the general principles of operation set forth in my patent No. 436,916 to the specific cases herein described, and accomplishing the same objects thereby." This patent is not in any sense primary, and must be limited to the precise improvements disclosed. There is in my judgment no room for a range of equivalents. In each of the forms of device disclosed a rock shaft completely takes the place of the stop rod of the earlier patent; the arms thereon performing the respective offices of releasing the escapement mechanism and of interposing the stop are in each case merely stops, lugs, or cams rigidly fixed or adjusted to the machine, and in each case the releasing attachment acts directly upon either the rack or the detent, accomplishing actual separation thereof. The specific cases provided for and the precise methods disclosed by this patent are found in neither of defendant's structures.

With respect to defendant's motion to strike out and suppress certain questions put to the witness Burridge on redirect examination, together with answers thereto, upon the ground that they are not properly redirect examination, and are thus in contravention of the order of this court of June 2, 1908: By reference to the cross-examination of the witness Burridge, I am unable to say that questions 433, 441, and 444 may not be to some extent germane to the subject-matter of the cross-examination. In my opinion questions 429, 430, 439, 440,

445, 446, and 452 are not proper redirect testimony, and an order may be entered striking out and suppressing those questions and the answers thereto. The delay in deciding this case has resulted primarily from the fact that for several months. following the submission of the final briefs I was obliged to do a large amount of work outside of my own district, and was thus unable until recently to give to the consideration of this case the time it seemed to require, in view of the size of the record, the nature of the issues involved and the large number of mechanical exhibits submitted.

It follows from the views stated that there should be a decree that both of defendant's machines infringe the first Gathright patent (with the usual reference for an accounting), and that the second Gathright patent is not infringed by defendant. As the patents have expired, injunction should not issue.