WEBER ELECTRIC CO. v. NATIONAL GAS & ELECTRIC
FIXTURE CO. (two cases).

(District Court, S. D. New York. March 24, 1913.)

1. PATENTS (§ 30*)—INVENTION—WHAT CONSTITUTES.

When a desired result is sought by those working in the art and skilled therein, but not obtained for lack of efficient means, which such persons are unable to devise, that another, by some seemingly simple change or adaptation of an old means or element of a combination, accomplishes the desired result or a better one, and his device proves commercially successful and largely displaces all others; it constitutes patentable invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 34; Dec. Dig. § 30.*]

2. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — INCANDESCENT LAMP SOCKETS.

The Weber patents, No. 743,206 and No. 916,812, each for an improvement in incandescent electric lamp sockets, construed, and held not anticipated, valid, and infringed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suits by the Weber Electric Company against the National Gas & Electric Fixture Company. On final hearing. Decrees for complainant.

Frank C. Curtis, of Troy, N. Y., for complainant.

Francis C. Lowthorp, of Trenton, N. J., for defendant.

RAY, District Judge. Two suits were brought by the same complainant against the same defendant. The testimony was taken in each case and printed. The cases were argued together. Both patents relate to improvements in incandescent electric lamp sockets. Patent No. 743,206 is dated November 3, 1903, and was issued on application filed December 10, 1902, and patent No. 916,812 is dated March 30, 1909, and was issued on application filed in July, 1904.

Patent No. 743,206 has five claims, but claim 5 is not in issue. Claims 1 to 4, inclusive, read as follows:

"1. In a device of the class described, the combination with a pair of members comprising a sheet-metal sleeve having a slotted end and introverted tongues, and a cap adapted to telescopically receive the slotted end of said sleeve, said members having interengaging parts adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by compression of said sleeve, of an insulating base for electrical fittings loosely inclosed within said sleeve in engagement with said tongues, substantially as described.

"2. In a device of the class described, the combination with a base of insulating material having a peripheral recess, and an incandescent lamp support mounted thereon, of an inclosing case therefor comprising in part a sheet-metal sleeve having a portion of its wall introverted to occupy said base-recess, substantially as described.

"3. In a device of the class described, the combination with a base of insulating material having a peripheral recess, and a screw-socket fixedly mounted thereon, of an inclosing case therefor comprising in part a sheet-metal sleeve having a portion of its wall introverted to occupy said base-recess and prevent a relative rotative movement between said sleeve, base and socket, substantially as described.

"4. In a device of the class described, and in combination a pair of members comprising a sheet-metal sleeve having a slotted end, and a sheet-metal cap adapted to telescopically receive the slotted end of said sleeve, one of said members being provided with a recess, and the other having a correspondingly located transverse slit and the wall on one side thereof displaced to form a projection beveled or inclined toward said recessed member and terminating abruptly at said slit, whereby said members are adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by manual compression of said slotted sleeve, substantially as described."

Claim 1 calls for a pair of members comprising (1) a sheet-metal sleeve having a slotted end and *introverted tongues,* and (2) a cap adapted to telescopically receive the slotted end of said sleeve, said members having interengaging parts adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by compression of said sleeve; also in combination an insulating base for electrical fittings loosely inclosed within said sleeve in engagement with said tongues, all substantially as described.

Claim 2 calls for (1) a base of insulating material having a peripheral recess, (2) an incandescent lamp support mounted thereon, and (3) an inclosing case therefor comprising, in part, a sheet metal

sleeve having a portion of its wall introverted to occupy said base-recess, all substantially as described.

Claim 3 calls for (1) the same base as claim 1, (2) a screw-socket fixedly mounted thereon, and (3) an inclosing case therefor comprising in part a sheet-metal sleeve having a portion of its wall introverted to occupy said peripheral recess of the base and prevent a relative rotative movement between said sleeve, base, and socket, all substantially as described.

Claim 4 calls for (1) a pair of members comprising a sheet-metal sleeve having a slotted end and a sheet-metal cap to telescopically receive the slotted end of said sleeve, *one* of said members being provided with *a recess*, and *the other* having a correspondingly located transverse slit and the wall on one side thereof displaced to form a projection beveled or inclined toward said recessed member and terminating abruptly at said slit, *whereby* said members are adapted to automatically interlock with a snap action when telescopically applied to each other and to be released by manual compression of said slotted sleeve, all substantially as described.

In claim 1 the sheet-metal sleeve has "a slotted end and *introverted tongues*," while in claim 4 nothing is said about "introverted tongues." The introverted tongues on the sleeve are adapted to engage with the recess in the inclosed porcelain body, and the insulating base is loosely inclosed within the sleeve *in engagement* with said tongues. This engagement is "to prevent rotative movement" between the sleeve and base, the latter being contained within the sleeve; that is, supported and kept in position especially when the lamp is being inserted in or removed from such base, or the screw-socket fixedly connected to such base. This applies to the keyless sockets as the key in the key sockets is connected to the base and as matter of course supports and keeps the base in position and effectually prevents rotation. The claims, calling for introverted portions of the wall of the sleeve member in combination with a base of insulating material having a peripheral recess, furnish a construction where, in telescopically assembling the parts, one movement or motion inserts the projections or introverted portions into the recesses in the base and by a push and a snap action locks the whole securely together. For the locking means by snap action we have a simple device. In the key socket the sleeve has a slot to receive the key, and as the base is loosely seated in the sleeve the sleeve wall near this slot may be pressed inwardly a sufficient distance to accomplish the purpose about to be described, or the base at that point may be cut away. In the keyless socket there is a perpendicular slot in the wall of the sleeve to make it compressible. Near the upper or inner end of the sleeve and at two points substantially opposite each other a slit or cut is made in the metal of the sleeve, and above the slit the metal is pushed outwardly in such a manner as to form a sloping projection of metal. These projections have a clean-cut lower edge— metal cut. They are integral with the wall of the sleeve, and form a part of it. In effect they are the bolts of the lock, used to lock the cap to the sleeve by a snap action. In the cap member are two half-moon cuts through the walls of the cap, a little distance above the lower edge of the cap member and located to engage with the projections.

described. The base of each half-moon aperture is clean-cut, metal cut. To assemble and interlock the two members, the sleeve member and the cap member, the sleeve is slightly compressed and inserted in the cap, and the projections on the sleeve, as the two are pushed together, enter and at once engage with the half-moon apertures in the cap. The two cut-metal edges engage. The two members cannot be separated without compressing by force the upper edge of the sleeve just below one of such projections. Such compression, so to speak, pushes back the bolt, disengages it from its socket, and the cap may be removed.

## Patent No. 916,812.

I think it well at this point to take up the patent No. 916,812, infringement of which is alleged in the second suit referred to. It cantains 14 claims, six of which are in issue, viz., 1, 2, 3, 8, 13, and 14. These claims read as follows:

"1. In a device of the class described and in combination, a pair of tubular, sheet-metal members, one adapted to telescopically receive the other, having mutually abutting cut-metal edges on the respective members to prevent relative rotative movement, and automatically interlocking means for preventing a telescopic movement of separation of one member from the other; said means permitting, without manipulation thereof, the telescopic application of the members to each other.

"2. In a device of the class described and in combination, a pair of interlocking, tubular, sheet-metal members, one adapted to telescopically receive the other, having mutually abutting cut-metal edges on the respective members to prevent a telescopic movement of separation of one member from the other when interlocked, and having other interengaging means for preventing a relative rotative movement of the interlocked members.

"3. In a device of the class described and in combination, a pair of tubular sheet-metal members, one adapted to telescopically receive the other, having mutually abutting cut-metal edges on the respective members to prevent relative rotative movement, and mutually abutting cut-metal edges on the respective members to prevent a telescopic movement of separation of one member from the other.

*    *    *    *    *    *    *    *    *    *

"8. In an incandescent electric lamp socket, the combination with the cap provided with an aperture in its end-wall and having its body slitted and portions thereof adjacent to the slits introverted on the side opposite said end-wall, of a washer of insulating material having a continuous circular periphery secured within said cap between the end-wall thereof and the cut-edges of said introverted portions.

*    *    *    *    *    *    *    *

"13. In a device of the class described and in combination, a pair of automatically interlocking tubular sheet-metal members, one adapted to telescopically receive the other, having mutually abutting cut-metal edges on the respective members to prevent relative rotative movement, and mutually abutting cut-metal edges on the respective members to prevent a telescopic movement of separation of one member from the other.

"14. In a device of the class described and in combination, a pair of members comprising a compressible sheet-metal sleeve, and a cap adapted to telescopically receive the slotted end of said sleeve, said sleeve and cap having interengaging portions adapted, when brought into line with each other, to automatically interlock with a snap-action when the sleeve and cap are telescopically applied to each other, one of said members being provided with a pair of longitudinal slits and having the metal between said slits displaced to one side of the body of the member, the other of said members being provided with a cut-away portion adapted to receive said displaced

portion to prevent rotative movement of one member upon the other when said members have been interlocked by telescopic application of one member to the other."

Practically speaking, all these claims in issue, except claim 8, relate to the same means for interlocking a cap member with a sleeve member carrying a base which has been roughly described in connection with patent No. 743,206; but we have an added element, viz.:

"Mutually abutting cut-metal edges on the respective members to prevent relative rotative movement," or "other interengaging means for preventing a relative rotative movement of the interlocking members."

Possibly claim 14 of this patent, in this connection, may be most important. Claim 14 calls, in combination, for a pair of members comprising (1) a compressible sheet-metal sleeve; (2) a cap adapted to telescopically receive the slotted end of said sleeve; (3) said sleeve and cap having interengaging portions adapted, when brought into line with each other, to automatically interlock with a snap-action when the sleeve and cap are telescopically applied to each other; (4) one of said members being provided with a pair of longitudinal slits and having the metal between said slits displaced to one side of the body of the member, that is, pressed outwardly to form a projecting portion with cut-metal edges; (5) the other of said members being provided with a cut-away portion adapted to receive said displaced portion to prevent rotative movement of one member upon the other when said members have been interlocked by telescopic action of one member to the other.

In addition to interlocking means by snap-action, the interlocking means being integral with and forming a part of the two members (cap and sleeve), as found in patent No. 743,206, to maintain telescopic union, we have here interlocking means by snap-action, the interlocking means being integral with and forming a part of the said two members, to absolutely prevent rotation of the one member on the other and their possible disengagement as a result.

It cannot, under the evidence in these cases, be successfully disputed that these structures have largely displaced those of the prior art. They present new and novel features in this art, have proved a commercial success, and are less expensive in construction and also safer. They are easier of assembling. Substantially all the sockets now on the market have the snap-shell construction, and the evidence establishes that at least 85 per cent. of such sockets are made by the Webers and their licensees.

### Date of Invention, No. 743,206.

As early as January 1, 1898, Weber had this invention completed and embodied in a practical form. He had also successfully tested and demonstrated it in connection with an inserted lamp. This is demonstrated by testimony, books, and physical exhibits. The time intervening between the completion of the invention and the filing of the application for a patent therefor is satisfactorily accounted for. I do not deem it necessary to go into the evidence on these subjects. There was no abandonment.

It is contended that patent No. 743,206, discloses no invention in view of the prior art, and that Fowler, No. 659,061, of October 2, 1900 (electric lamp), Bray, No. 170,703, of December 7, 1875 (paint can), Oetting, No. 642,825, of February 6, 1900 (sockets for incandescent electric lamps), and Kenny, British patent, No. 10,429, of May 15, 1896 (holder for electric glow lamps), anticipate. Weber in invention antedates (both issue and application dates) the Fowler patent, both of Kenney's United States patents, No. 712,685 and No. 712,686, of November 4, 1902 (sockets for incandescent lamps), the Oetting patent, and the Paiste patent, No. 696,261, of March 25, 1902 (incandescent lamp socket). The Bray patent of December 7, 1875, and the Kenny British patent, of May 15, 1896, were part of the prior art when Weber made his invention. The others referred to were not. Weber's application was filed December 10, 1902. The Fowler patent was issued October 2, 1900, the Bray patent December 7, 1875, the Oetting patent February 6, 1900, and the Kenny British patent May 15, 1896, more than two years prior to December 10, 1902.

The Kenny British patent shows that it was not new to slit sheet metal and form tongues by cutting out portions of the metal. These tongues could be bent outwardly or inwardly. Parts of same could be bent so as to form hollows in which a lamp shade could rest. Says the patent:

"By my improvement I form the holder in one piece, forming the outside of same with an even surface. In order to attach a shade to my improved holder, I stamp or form in one piece in any convenient manner a tube or ring consisting of a number of spring tongues. The parts of the spring tongues which engage with the shade are bent inwards to form a series of hollows in which the shade top rests. The opening in the top of the shade may be easily passed over the said spring tongues, and on forcing the *said tube* over the lamp holder (with smooth surface) the spring tongues are expanded radially (forced outwardly) and grip the holder and shade, firmly securing the latter in position."

I find nothing in this patent that could have suggested the combination of the Weber patents or the mode and manner of forming the interlocking means employed by the inventor.

The Bray patent is for a "paint can," and the "invention relates to a self-sealing can." So far as applicable here, it provides in claim 2 for—

"a can-cover provided with two or more spring-catches, *d'*, formed by cutting two or more openings through the vertical flange of the cover, and bending the upper edges of the stock below said openings inward, as set forth, in combination with a can having two or more recesses, *e e*, formed in its vertical sides, and adapted to engage with said spring-catches to lock the cover on, substantially as described."

This provides, as more particularly described in the specifications, for locking the can-cover to the body of the can. It is done in the following manner: Two or more indentations are made in the can-body near its top, of course, "without cutting," which upset or stretch the metal and form what the claim calls "recesses." There is no cut-metal edge here. Two or more openings, to correspond with the recesses, are cut in the flange of the can-cover and the portion of the can-body immediately below the cut is pushed and bent inwardly.

When the cover is pushed down on the can, the cover telescopically receiving the upper part of the can-body, the inwardly bent portions enter the recesses. As the cover is pushed down, these "catches" or bent-in portions are pushed out until they reach the recesses, when they spring back into position and enter the recesses. This device for holding the can-cover to the can is more frictional than otherwise. We have no cut-metal edge engaging another cut-metal edge for any purpose, and the patentee states that the cover is disengaged from the can by giving the former—

"a partial rotation, so as to remove the catches $d'$ from the recesses 2, when the cover may be removed without hindrance."

Such a locking device transferred to the lamp sockets would be wholly ineffectual and inoperative for the uses of Weber. But I am of the opinion that the art of paint-can construction, or can construction in general, is not an art at all analogous to that of incandescent electric lamp socket construction. While an inventor in the latter art is presumed to know what has been done before in that art, he is not required or presumed to be familiar with can construction of any sort, especially those designed for some special use. One of the main and controlling ideas of these Weber patents is that the unlocking of the parts is done, not by a rotation of either of the parts, but by, so to speak, an unbolting process; that is, by pressing the bolt back out of its socket and then pulling the sleeve away from the cap. This process in the Weber patent has been described heretofore and need not be repeated.

[1] When a desired result is sought by those working in the art and skilled therein, but not obtained for lack of efficient means, which such persons are unable to devise, and another comes into the field and by some seemingly simple change and adaptation of an old means or element in a combination of elements to the doing of the work is able to do the desired work, accomplish the desired result, a new result, or a better result, by such new means operating differently from anything known in that art, or an analogous art, and such device proves commercially successful, and largely displaces all others, and is more efficient and just as durable, or even more durable, and is less costly in construction, do we have invention, or do we not? The electrical art is not old. The construction of electrical appliances is in its youth. True, Weber did not startle the electrical world, or make a daring plunge into the unknown; but he did conceive and make an improved and a safer and a less expensive incandescent electric lamp socket, which, on its merits, has gone into general use and substantially monopolized the trade. All this is persuasive evidence of invention. He "added something of value to the sum of human knowledge," he "made the world's work easier, cheaper, and safer," and "a return to the prior art would be a retrogression." The device has achieved undisputed success, and accomplishes a result not obtained before in this important field. The device is new, useful, and in large demand. Therefore the device is patentable, and there was invention. O'Rourke Eng. Co. v. McMullen (C. C. A. 2d Circuit) 160 Fed. 933, 88 C. C. A. 115.

September 16, 1899, when Oetting filed his application for his patent, No. 642,825, dated February 6, 1900, Weber had already made his invention. The Oetting patent was not a part. of the prior art, but was cited in the Patent Office, having been granted when Weber filed his application for patent No. 743,206. Weber then differentiated Oetting, and it is now claimed that Weber is precluded from having his patent so construed as to cover the device of the Oetting patent. The Oetting patent has a cap and a shell and an inclosed base. What is spoken of in Weber as a "sleeve," .generally speaking, is spoken of in Oetting as—

"sheet-metal socket *3* * * * provided with the body portion *5*, which is circular in cross-section and has at the open end *5'*, opposite the globe *2*, a series of spring catches *6*. These spring catches are formed by cutting lengthwise (perpendicular cuts) into the metal of the body portion *5* of the socket a sufficient distance from the open end *5'*, as at *8*, and then *bending down the end* of the metal between the cuts *8* to form the flanges or lips *9* of the catches *6*."

If desired, these lips of metal can be reinforced or bent outwardly from the face of the body portion of the socket, so as to project therefrom slightly. That is, we have two perpendicular slits in the upper end of the socket, and the metal between the slits is bent over outwardly, so as to form the catches designed to engage the cap. If this bent-over portion is bent outwardly, more force must be applied both in engaging and in disengaging the socket and cap. The flange of the cap which fits over the upper end of the body portion of the socket has openings or slots formed or cut therein to correspond with the catches in the socket, just described. These cuts or slots are at right angles to the cuts in the body portion of the socket. That is, horizontal slots or bolt sockets are cut out of the cap at appropriate points to receive the catches before described. The cap and socket are engaged or assembled as follows: The catches are and must be pressed in by hand and manually held until the cap is fitted over the body portion of the socket, and until the socket is pushed far enough into the cap to engage and hold back the catches. This is a somewhat difficult thing to do. When this has been done, the socket is pushed into the cap, or the cap onto the socket, until the catch on the socket enters the slot in the cap. To disengage or remove the socket from the cap, the operator must push back these catches with his fingers, or some instrument, so as to entirely disengage one or more from the slots—a difficult operation. To show the wide dissimilarity of Oetting from Weber, as well as the vast superiority of Weber over Oetting, I quote from the Oetting specifications:

"The use and operation of my improved socket for incandescent electric lamps is as follows: After the globe *2* has been inserted within the socket *3* of the lamp *1*, which contains the device for holding the wires and the other parts for operating the lamp *1*, and it is desired to place the cap *4*, encircling the wires, onto the body portion *5* of the socket *3*, all that is necessary is to insert the open end *5'*, on the body portion *5* of the socket *3* within the flange *4'* of the cap *4* and bring the slots *11* in said flange *4'* opposite the spring-catches *6*. The operator can then force inward the catches *6* by pressing with his fingers on the bent portions *10* thereof, when the flange *4'* on the cap *4* can be slipped or pushed farther onto the body portion *5* of the

socket *3*, which will allow the lips *9* on the catches *6* to spring into the slots *11* on the flange *4'* of the cap *4* and secure said cap *4* on the said body portion *5* of said socket.

"In case it is desired to remove the cap *4* for any purpose, all that is necessary is for the operator to press with his fingers against the catches *6*, which will cause said catches *6* to be forced inwardly and free the lips *9* thereon from the slots *11* in the flange *4'* of the cap *4*, when the cap *4* can be removed from the body portion *5* of the socket *3* and so allow the catches *6* to spring back to their normal positions. The slots *11* in the flange *4'* of the cap *4* are made slightly longer than the lips *9* on the catches *6*, in order to give sufficient play for the lips *9* therein, and when the outwardly-bent portions *10* on said catches *6* are used they act to enable the operator to press the catches inward more easily and quickly."

In Weber neither in assembling nor disassembling is any finger, digital, or instrumental manipulation of the spring catches themselves required. The cap and socket of Oetting are *not "adapted to automatically* interlock with a snap action when telescopically applied to each other," in the sense of or within the meaning of the Weber patent, where we have no spring catches and no manipulation thereof whatever. The catches, beveled projections, move with the walls of the socket, not independently of them, as in Oetting. The body of the socket is slightly inserted in the cap and the two are pushed together; the flange of the cap riding over the projections or catches (not spring catches) of the socket until the two parts automatically engage with a snap action.

The contention of the defendant on this branch of the case seems to be that, while the Patent Office did not regard either Oetting or Kenny as an anticipation, it did consider that there was no invention in Weber in view of those patents, unless Weber was restricted to the specific forms of interlocking projections disclosed by him. After referring to the amendments made by Weber, the conclusion of defendant seems to be that, limiting Weber to the specific forms described, the defendant does not infringe.

### Defendant's Structure.

The defendant has the sleeve and the cap, and the base of insulating material seated in the sleeve, which is compressible on such base; that is, the base is so formed that the sleeve may be easily compressed by thumb or finger pressure to release the lock—disengage the bolt or projection. The defendant has no projection outwardly or inwardly on the sleeve member. It has transferred this feature to the cap. It has transferred the recess or bolt socket to the sleeve. But claim 1 of patent No. 743,206 says:

"Said members having interengaging parts adapted to interlock with a snap action," etc.

And claim 4 says:

"*One* of said members being provided with a recess and *the other* having a correspondingly-located transverse slit and the wall on one side thereof displaced to form a projection beveled or inclined *toward said recessed member* and terminating abruptly at said slit, whereby," etc.

It is immaterial, so far as infringement is concerned, which member is recessed and which has the projection; and it is equally immaterial

whether the wall on one side of the transverse slit is displaced outwardly or inwardly, provided it be inclined or beveled toward the recessed member and terminate abruptly. Defendant's device or socket complete has: (A) A pair of members, comprising (1) a sheet-metal sleeve having a slotted end, and (2) a sheet-metal cap adapted to telescopically receive the slotted end of said sleeve. (B) One of such members in defendant's device, the sleeve, is provided with a recess—two recesses, in fact, as the recess of the same shape as that shown in complainant's device is divided by a bridge of metal (metal not cut out) for a purpose to be described. But this recess or these recesses have the cut-metal edge adapted to engage with the bolt or projection of the other member at its cut-metal edge, or one of its cut-metal edges; there being two bolts or projections, separated by a slit or opening made to receive the said bridge of metal on the other member. (C) This other member has "a correspondingly-located transverse slit—four slits, in fact, two perpendicular and two horizontal, so that a portion of the metal is cut out of the flange of the cap to form the opening which receives the metal bridge spoken of when the members are assembled. (D) The wall of this cap member on each side of this opening, formed by the cut-out portion, is displaced by being pressed inwardly to form a projection on each side of such opening, and does form such projections—projecting inwardly to engage with the openings or recesses in the walls of the sleeve (other member) when telescopically assembled. (E) These projections, as we look at the cap from the outside and from beneath the projections, are actually inclined *toward* said recessed member, the inclosed sleeve, and terminate abruptly at the slit. Looking at these projections from the interior of the cap, each terminates abruptly at the slit, or *slits,* in fact, and each projection, each of them, is beveled or inclined toward said inclosed recessed member. The result is that, when the end of the recessed sleeve is inserted in the open end of the cap and the two members are pushed together, the bridge (described) enters between the two projections on the interior face of the cap, and as cut-metal edge meets cut-metal edge rotation of the one member on the other is impossible.

As the members by a push are forced together, the outer face of the sleeve above the recess *rides up* the slope or beveled face of the projections on the inner face of the cap; the wall of the sleeve being gradually forced inward until the projections suddenly drop into the recesses of the sleeve with a snap-action, the wall of the sleeve suddenly resuming its normal position. The cut-metal edge of the transverse slit in the sleeve now engages the cut-metal edge of the transverse slit in the cap, or rather the edge of the projection which terminates abruptly at such slit. To disengage and remove the cap, the wall of the sleeve near the lock is pushed inwardly and away from the flange of the cap which carries the projections; that is, the recess or socket for the bolts of the lock are pushed away from the bolt, instead of the bolt being withdrawn from the recess or bolt socket. With some ingenuity the maker of the defendant's device has combined at substantially one point of the socket (spoken of as an assembled whole) the transverse and perpendicular cuts or slits and projections of complainant's device.

But everything shown and described and claimed by the complainant is found in defendant's device, and in its combination, operating in substantially the same way to produce the same result. There are changes in form and location, but that is all. The two devices work in obedience to the same laws and on the same principle. It seems to me that defendant's expert substantially admits the presence in defendant's socket of each and every element of complainant's two patents in suit, operating in substantially the same way to produce the same result.

Defendant has not followed or copied Kenny or Oetting, but has followed and copied substantially the two patents in suit. Above I have described the exhibit "Complainant's Exhibit, Defendant's Key Socket." In substance I have also described the exhibit, "Complainant's Exhibit, Defendant's Keyless Socket." The exhibit, "Defendant's Exhibit, Defendant's Keyless Socket," is a somewhat different structure. Here we have cap and sleeve and inclosed base, with a cut-out portion in the sleeve to make it compressible. The recesses of peculiar shape forming part of the interlocking means are in the flange of the cap, instead of in the sleeve. A recess is cut perpendicularly in the base to receive an inwardly turned portion of the wall of the sleeve, cut for the purpose, and the function of this projection is to prevent the turning of the shell about the base. The recesses referred to are cut in the shape of a flaring dish, the cuts on each side of the opening being, for about two-thirds the distance from base to top, at an angle of some 45 degrees and then perpendicular. The base cut or slit is transverse. The top slit, starting at one side, runs for a distance parallel to the base slit, then downward towards and to the center on the same angle with the sloping side, then upward and outward on the same angle as the slope of the other side to the surface line and then out to the side.

Here we have a cut-out opening or aperture in the flange of the cap with no less than nine sides, so to speak; that is, two top slits, one bottom slit, and five side slits. To an extent corresponding slits are made in the walls of the sleeve near its top, and the metal, so far as released by these cuts, is forced outwardly, forming a dish-shaped projection with cut-metal edges, which, when the cap and sleeve are telescopically assembled, coact or engage, cut-metal edge to cut-metal edge, with the recessed cut, and effectually prevent the rotation of the cap on the sleeve, or rotation of the sleeve within the cap, and also the removal of the cap from the sleeve until the wall of the sleeve is pressed inwardly to disengage this projection from the recess. This projection is also beveled or inclined towards said recessed member. Here are the same elements, in the same combination, operating in substantially the same way, and in obedience to the same laws, to produce the same results as are called for by complainant's patents. I cannot escape the suspicion, if not conclusion, that this was a studied attempt to copy, but still evade the *letter* of, the applicable claims of the patents in suit.

Dr. Hering, defendant's expert, seems to contend that the fourth claim of Weber was only allowable and allowed only when the words

"transverse slit and the wall on one side thereof displaced to form a projection" were inserted. He then says, in substance, that:

"Defendant's structure shows a T-shaped opening cut in the wall of the flange of the cap and the walls adjoining this opening formed into, *not one, but two projections*, beveled or inclined towards the recessed member, and each terminating abruptly in two different sides."

Assume this to be so; has defendant escaped infringement? He has used the spirit of complainant's invention; its principle and its elements all operating in the same way to produce the same result. Weber is not limited in the number of his projections, and if the projection is formed by making a transverse slit and displacing the metal of the wall on one side thereof, such projection being beveled or inclined towards the recessed member and terminating abruptly at the slit, can defendant escape infringement by meeting the transverse slit with a perpendicular slit, and displacing the wall on one side of each slit at the angle thus formed, so as to form a projection; such projection being beveled or inclined toward the recessed member *in two directions,* and then forming another similar projection in the other angle of the T-shaped cut or slits? I think not. It may be an improvement, and it may not be; but infringement is not avoided by mere change of form or location, or by merely adding something, without changing the mode of operation or result.

The functions of the slits, displacements, projections, and recesses are the same as in complainant's claims. The head of the T in "Defendant's Keyless Socket" is a transverse slit, and the wall on the lower side thereof is displaced inwardly to form a projection, which is beveled or inclined towards the recessed member, and it terminates abruptly at the slit. By cutting out a portion of the metal below the slit forming the head of the T and forming a stem (open or cut-out stem) the inward projection is divided into two. The purpose of this is obvious, on looking at the quadrant-shaped openings or recesses in the sleeve, made quadrant-shaped instead of semilunar by leaving the metal bridge or rib, and which rib engages the cut-metal edges formed by dividing the projection. By dividing the projection, this bridge is given a function. The cut-out portion, which divides the projection, is the equivalent of a similar cut-out portion found in complainant's exhibit, "Complainant's Socket No. 2," to the left of the semilunar opening, and the bridge or rib is the equivalent of the slitted and displaced portion just below in the wall of the sleeve. The openings in the sleeve wall have no added or new function, and the projections perform the old function. The cut-out portion of the projection forms an opening, and the bridge across the opening or recess in the sleeve has a function, viz.: It engages with the opening in the flange of the cap and which divides the elevation.

If defendant intends to make a point on the *mere form* of complainant's device, including slits and recesses and elevations, it is sufficient to say that the allowed claims of the patents in suit are not confined to any particular form, except in the particulars mentioned, and so far as limited the defendant has substantially copied.

The claims calling for the introverted parts of the wall of the sleeve

to engaged with the base are attacked, as is the claim for means to hold the washer of insulating material in the cap member, being claim 8 of patent No. 916,812. When we consider the importance of this washer of insulating material, and its position in the cap, and the necessity for noncumbersome and efficient means for holding it in place, combined with ease and speed in placing it in position, I am of the opinion that claim 8 discloses invention and is valid. The defendant has copied this feature exactly. This and infringement by others and commercial success and the fact that it had not been done before in this manner indicate more than the skill of the mechanic. While an introverted tongue of metal cut from the walls of the inclosing case and engaging with a recess in the wall of the base of insulating material may not disclose a high order of invention, still I think, in view of the prior art, that these claims are valid. The Fowler patent, No. 659,061, dated October 2, 1900, and applied for October 26, 1898, shows "the base of the (a) lamp consisting of a cylindrical or other shaped shell and having located therein the slots or openings $F$" (cutout portions), two in number and located opposite each other; also a collar with tongues cut therein at such points that they will be exactly opposite or align with the slots or openings when the collar carrying the lamp globe is slipped within the shell. The collar is then fastened to the shell by bending over the tongues into the slots. These tongues may be made long enough so that they may be bent a second time and "clinched upon the base." The patent says:

"The base $E$ being slipped upon the collar $D$ so that the tongues $G$ will align with the openings $F$, said tongues being then deflected by means of a suitable implement $J$, so that," etc.

The Paiste patent, No. 696,261, shows the cap and sleeve held together by means of screws, a concededly insecure fastening, and these screws project into slots in the insulating lining or bushing, and the old bayonet joint. These screws enter far enough to enter recesses in the procelain body, so as to maintain the whole in a fixed position; that is, prevent rotation.

I mention these things to show that they have been considered with other devices not mentioned, and also to show the cumbersome, expensive, insecure, and unhandy condition of this art prior to the Weber invention. I do not think it inapt to say that Weber revolutionized this art. All these things are used in combination, and to complete and make useful and effective and efficient one whole—an incandescent electric lamp socket. All these devices coact to one end and purpose—the production of electric light. They are assembled and used as one whole to produce a given result, and I see no merit in the contention that we have an aggregation and not a combination. The insulating base, the sleeve, the cap, and means mentioned for effectively permitting them to be assembled and held together when in actual use and disassembled for various purposes, all go together as one device, and must be considered as one whole.

Much was said on the argument and considerable discussion is found in the proofs as to the construction and meaning of the words "supported within the sleeve" and "to assist in supporting the same within

the sleeve," found in the specifications of patent No. 743,206. I do not find the words or their equivalent in the claims. The patent says:

"If desired, the loosely-fitting insulating base *3* may be supported within the sleeve by means of one or more tongues *15*, formed by slitting and bending inwardly portions of the sleeve-wall adapted to engage said base, which may be provided with a groove or recess *16*, adapted to receive the several tongues.

"In Fig. 3 I have shown a keyless socket, the sleeve *17* being provided with no slot for a key, but with a narrow slot *18*, adapted to render the inner end of the sleeve compressible. The cap *19* is provided with inward projections *20*, inclined inwardly toward and terminating abruptly at their inner ends, whereat the shell is slitted, and adapted to enter apertures *21*, formed in the sleeve by cutting and introverting portions thereof to form tongues *22*, which enter grooves or recesses *23* in the inclosed loosely-fitting insulating base *24* to assist in supporting the same within the sleeve and to prevent rotative movement between said sleeve and base when a lamp is being inserted in or removed from the screw-socket *25*, fixedly connected to said base."

I can see but one meaning to be given the words quoted, and that is that, as the insulating base is "loosely inclosed" in said sleeve, it would be important to prevent the rotation of the sleeve about the insulating base, and also the tipping and rattling of such base within the casing or sleeve and cap. Provide the base with a groove, slit and bend inwardly portions of the sleeve wall into engagement with the groove, and you have effectually accomplished both objects. I think the effort to give these words any other meaning far-fetched and imaginative. Owing to the shape of the sleeve, its construction, no other support is or can be required. It cannot drop out unless the cap is removed, and when this is done it is for the purpose of getting at and removing the base. You may have a support for a barn by building a wall under it or placing posts on the earth underneath the sills. You may support a tree by a wire attached to it and some neighboring object. You support transverse beams in a structure by walls or posts under them, and you support uprights by resting them on the sills, and also by means of braces reaching from sill to upright at a distance above, or by nailing boards across at right angles, and in other ways. Here the main purpose of these introverted tongues was to prevent rotation, and then, incidentally and perhaps necessarily, to secure good results, prevent the tipping and rattling of the insulating base within the inclosing metal case, sleeve, and cap.

In relation to patent No. 916,812, the defendant contends that there is no coaction whatever between the means described for preventing separation of cap from sleeve and those for preventing relative rotative movement of cap and sleeve; that each is a distinct and separate device. It also contends that, while the application for this patent did recognize that the device which prevents rotation would prevent relative rotation of cap and sleeve, the *intended* function was the guiding function; that is, that the slot in the cap, coacting with the outwardly bent portion of the sleeve, would serve as a sure guide for the entrance of the projection with cut-metal edge into the semilunar opening in the cap. It does serve as such a guide, and hence for the effective working of the device as a whole the two openings in the cap and the two projections in the sleeve coact to produce a single

result. But in point of fact it does more than act as a guide, for it effectually prevents relative rotation and possible disengagement of the other interlocking means, and consequent separation of cap from sleeve, and hence all these slits, openings, and projections act together, in unison and harmony, to securely and effectually interlock cap and sleeve. Without the guide device spoken of there is a quite sure interlocking against both telescopic movement of separation and relative rotary movement; but both together make the device more safe and secure—more perfect and useful. And when Weber saw what these added slits, etc., would do, he was entitled to claim all the benefits of his invention, all that it would and does accomplish. No one can defend against infringement on the ground the inventor did not at first comprehend, understand, and claim all that his invention would accomplish, provided he does claim it and secure his patent within the time limited by statute. Defendant concedes that in writing his claims the patentees were within their rights, notwithstanding the long delay in the Patent Office.

[2] On careful study of the patents and testimony, with many physical exhibits, and the prior art, and a careful reading and consideration of the able and voluminous briefs submitted, I arrive at the conclusion that the claims of the patents in issue are valid and infringed, and there will be decrees accordingly, with costs.

As to the motion to consolidate, it seems to me little, if anything, will be gained by such action. The testimony was taken in both cases and has been printed. On appeal, but little can be omitted. The Circuit Court of Appeals will, of course, hear both cases at the same time, if an appeal is taken, and regulate costs as justice demands.