WEBER ELECTRIC CO. v. UNION ELECTRIC CO.

(District Court, D. New Jersey. July 29, 1915.)

1. PATENTS ⬥⇒328—VALIDITY AND INFRINGEMENT—ELECTRIC LAMP SOCKET.
    The Weber patent, No. 743,206, for an incandescent electric lamp sock-
    et, claim 4, is not limited, either by the prior art or by amendments made
    in the Patent Office, to the precise structure shown and described, but, in
    view of its advance over the prior art and the general adoption of the
    device, it is entitled to a fair range of equivalents; also *held* infringed.

2. PATENTS ⬥⇒168—CONSTRUCTION—EFFECT OF AMENDMENT OF CLAIMS.
    The limitation imposed by an amendment of a claim to meet objections
    of the Patent Office will be given its necessary effect, but the estoppel
    will not be extended beyond that.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec.
    Dig. ⬥⇒168.]

3. PATENTS ⬥⇒243—INFRINGEMENT—CHANGING FORM OF STRUCTURE.
    Merely changing the form or location of the mechanical elements of a
    patented structure does not avoid infringement, if such alterations are
    but different ways of mechanically expressing the dominant feature of
    the inventive idea and achieve the same result in substantially the same
    way.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 382–384; Dec.
    Dig. ⬥⇒243.]

In Equity. Suit by the Weber Electric Company against the Union
Electric Company for infringement of letters patent Nos. 743,206
and 916,812, for incandescent electric lamp sockets, granted to August
Weber November 3, 1903, and March 30, 1909, respectively. On
final hearing. Decree for complainant.

Frank C. Curtis, of Troy, N. Y., for complainant.
Francis C. Lowthorp, of Trenton, N. J., for defendant.

RELLSTAB, District Judge. The patents in suit have been ad-
judicated valid in suits brought by the complainant against the Nation-
al Gas & Electric Fixture Company in the United States District Court
for the Southern District of New York. 204 Fed. 79. These adjudi-
cations were sustained on appeal, except as to one claim not involved
in the present contest. 212 Fed. 948, 129 C. C. A. 468. The defend-
ant in the present suit concedes that, by reason of its relation to those
suits in the Second circuit, it is bound by such adjudications, and that
the complainant is entitled to a decree for an injunction as far as
concerns "Complainant's Exhibit, Defendant's Key Socket," "Com-
plainant's Exhibit, Defendant's Keyless Socket, No. 1," and "Com-
plainant's Exhibit, Defendant's Keyless Socket, No. 2," exemplified
in this case, "or any socket which would actually infringe either of
said patents." The only issues remaining are whether the complain-
ant is entitled to more than nominal damages in the case of the con-
ceded infringements, and whether "Complainant's Exhibit, Defend-
ant's Key Socket, No. 2," made the basis of the supplemental bill filed
in this cause, and admittedly made and sold by the defendant, is an
infringement of claim 4 of patent No. 743,206.

[1] The mechanism of each structure is a casing composed of two members made of resilient sheet metal—a sleeve member adapted to being telescopically engaged within a cap member. On the sleeve member are projections which fit into correspondingly located perforated recesses cut out of the cap member. These members, in assembling, are automatically interlocked by a snap action, and are thence incapable of being accidentally separated. The sleeve member is slotted at its inner end to enable it, through compression, to be detached from the cap member. There are differences between the two devices in the construction of the projections and the corresponding recesses, and in the means employed to bring them into engagement, which differences are the basis of the defendant's contention that its socket casing does not infringe. These differences will be particularly stated and considered later on.

The defense is that claim 4 is limited, first, by the state of the prior art, and, second, by the concessions made by the applicant while his application was pending in the Patent Office, and that, thus limited, defendant's socket casing does not infringe. This defense, notwithstanding that the patent in question has been adjudicated valid, requires that we first ascertain just what Weber invented, and then whether claim 4, as it emerged after the objections made in the Patent Office, covers the defendant's structure. Of the patents cited against this claim, Mr. O'Neill, the defendant's expert, concedes that none has any greater bearing upon that claim than the Bray, No. 170,703, the Oetting, No. 642,825, and British Kenney, No. 10,429 (Answer to X-Q. 230). These were all before the courts of the Second circuit in the cases referred to. Bray was held to be in an unanalogous art, and all were held to be for structures dissimilar to Weber's, and nonanticipatory of his invention. I find myself in accord with such views.

Claim 4 took the place of claim 7 in the original application, and reads as follows:

"4. In a device of the class described, and in combination a pair of members comprising a sheet metal sleeve having a slotted end, and a sheet metal cap adapted to telescopically receive the slotted end of said sleeve, one of said members being provided with a recess, and the other having a correspondingly located *transverse slit and the wall on one side thereof displaced to form a* projection beveled or inclined toward said recessed member and *terminating abruptly at said slit,* whereby said members are adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by *manual* compression of said slotted sleeve, substantially as described."

The italicized parts of this claim and of the quoted parts of the application for patent, presently to be stated, show the amendments that were made to overcome the objections to several of Weber's claims by the Commissioner of Patents, who based his objections on Oetting, No. 642,825, and Kenney (U. S.) No. 712,686.

As stated by Weber in his application, his principal object was "to provide a simple and effective automatically locking connection between the sleeve and cap of an incandescent electric lamp socket." To accomplish this, he made the sleeve compressible, and provided both

members "in the manner hereinafter described with inter-engaging parts adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by compression of said inner member." Of such "inter-engaging parts" there were, projections, *14*, formed "on the exterior of the sleeve near its inner end, as by slitting the sheet metal at right angles to the slot, *12*, and forcing outwardly a portion of the metal shell on the inner side of such slit, the projection thus formed terminating abruptly at its outer end `at said slit` and inclining inwardly therefrom toward the inner end of the sleeve, as shown." The cap was "provided with apertures, *13*, arranged to correspond with the position of the projections, *14*, and adapted to receive said projections, respectively, when the parts are telescopically applied to each other." The outward inclination of the projections on one member and their terminating abruptly at their outer ends furnished the means to permit an automatic locking by a snap action when the apertures on the other member were brought opposite such projections in telescopically assembling such members. Once locked, the accidental separation of the members was prevented. To separate them, manual compression of the member having the projections was necessary. This compression was readily accomplished by reason of such member having therein a slot extending from its inner edge. From this recital, it will appear that in assembling the members nothing beyond telescopically applied pressure was necessary to effect interlocking. The prior art produced no such automatic interlocking.

In Oetting, the cap was attached to the sleeve by bringing spring catches cut from the sleeve into slots cut into the cap. This could not be accomplished by merely forcing cap and sleeve together. To assemble these parts the catches had to be pressed inwardly by the fingers or other means, as they were bent over on the ends to fit into the slots in the cap. As was said by Judge Ray, in Weber Electric Co. v. National Gas & Electric Fixtures Co. (D. C.) 204 Fed. 79, at page 87:

"In Weber neither in assembling nor disassembling is any finger, digital, or instrumental manipulation of the spring catches themselves required. The cap and, socket of Oetting are *not 'adapted to automatically interlock with a snap action when telescopically applied to each other,'* in the sense of .or within the meaning of the Weber patent, where we have no spring catches and no manipulation thereof whatever. The catches, beveled projections, move with the walls of the socket, not independently of them, as in Oetting. The body of the socket is slightly inserted in the cap and the two are pushed together; the flange of the cap riding over the projections or catches (not spring catches) of the socket until the two parts automatically engage with a snap action."

In Kenney (U. S.), the shell was provided with open-end slots and slots adjacent thereto. Radial inwardly projecting studs on the cap were adapted to enter these open-end slots in the shell, and then by a rotary movement, after the telescopic application was completed, to spring into the adjacent slots. In combination with these slots and studs, the shell was provided with bayonet slots, intermediate of the others referred to, and the cap was provided with additional radial projections, intermediate of the studs referred to, which entered re-

cesses within the periphery of the socket base or insulator block to lock the same in position. No interlocking of the Kenney members could be effected automatically by telescopic pressure. A rotary movement of the members against each other was absolutely necessary to put the radial projections and the intermediate lugs into position to effect a locking engagement.

Weber's invention consisted, not in the precise form in which his projections were made, but in projections formed by displacing a part of a slotted member of a two-member socket casing at one side of a slit cut therein, the projections being so beveled as to permit their entrance into recesses cut out of the other member of such casing and automatically interlocking therewith, said projections so abruptly terminating at such slit as to effect a positive barrier to a separation of the members; when thus interlocked, without a deliberate and positive compression of the slotted member of the casing. Neither of the structures disclosed by the cited patents anticipated Weber, and no other than explanatory amendments to claim 7 were necessary to overcome these citations.

What was the effect of the amendments actually made to that claim? Claim 7, out of which claim 4 evolved, made no mention of a slit. It dealt with the formation, location, and abrupt termination of the projections in broad terms. The specifications, however, stated that the projections were formed "on the exterior of the sleeve near its inner end, as by slitting the sheet metal at right angles to the slot 12 and forcing outwardly a portion of the metal shell on the inner side of such slit, the projection thus formed terminating abruptly at its outer end," from which, as well as from the drawings, it was manifest that a slit made transversely to the slot extending down the sleeve from its inner end was a means usable in locating, forming, and abruptly terminating such projections. The interpolation in the claim of the words "transverse slit and the wall on one side thereof displaced to form a" projection, and the phrase "at said slit" in connection with the abrupt termination of such projection, brought the claim to conform to the structure originally described and illustrated, and made such slit or its equivalent a necessary element in the combination claimed.

[2] The defendant's insistence that Weber, in thus putting in this additional element—transverse slit—to this claim, tied himself "to the specific structure disclosed in which the inclined projection on one member terminates abruptly at the transverse slit," in my judgment, is too restricted. This would deprive such claim of the benefit of any range of equivalents. The defendant's expert, Mr. O'Neill, in answer to X-Q. 36, conceded that, in his interpretation of such claim in comparison with defendant's structure, he considered it was entitled to the benefit of the doctrine of equivalents. To treat it otherwise would be to extend the estoppel arising from making such amendment beyond both the reason for making it and the proper scope of the amendment. Having yielded to the pressure of the Patent Office, the claim will be confined to the limitation imposed by the amendment; but this is as far as the estoppel goes. National Hollow Brake-Beam Co.

v. Interchangeable Brake-Beam Co., 106 Fed. 693, 45 C. C. A. 544; Wayne Mfg. Co. v. Benbow-Brammer Mfg. Co., 168 Fed. 271, 93 C. C. A. 573; Seeger Refrigerator Co. v. American Car & Foundry Co. (N. J. C. C.) 171 Fed. 416, affirmed 178 Fed. 278, 101 C. C. A. 542; Long v. Noye Mfg. Co. (C. C. N. Y. W. D.) 192 Fed. 566; Scaife & Sons Co. v. Falls City Woolen Mills, 209 Fed. 210, 126 C. C. A. 304; National Tube Co. v. Mark, 216 Fed. 507, 133 C. C. A. 13.

Weber's structure did not enter an art already well filled with devices accomplishing like results. His conception carried him well in advance of any competitor in that field at the date of his invention, and the mechanism embodying his conception has largely displaced other makes of electric lamp socket casings. On this subject, Judge Ray, in the National Gas & Electric Fixture Co. Case (D. C.) 204 Fed. 79, at page 83, said:

"It cannot, under the evidence in these cases, be successfully disputed that these structures have largely displaced those of the prior art. They present new and novel features in this art, have proved a commercial success, and are less expensive in construction and also safer. They are easier of assembling. Substantially all the sockets now on the market have the snap-shell construction, and the evidence establishes that at least 85 per cent. of such sockets are made by the Webers and their licensees."

And at page 85 he said:

"The electrical art is not old. The construction of electrical appliances is in its youth. True, Weber did not startle the electrical world, or make a daring plunge into the unknown; but he did conceive and make an improved and a safer and a less expensive incandescent electric lamp socket, which, on its merits, has gone into general use and substantially monopolized the trade."

Such an advanced step in the art is not to be restricted to the precise mechanism shown, unless the limitations of the claim force such a result. Such a consequence does not necessarily flow from the amendments made to this claim, and it is entitled to a fair range of equivalents.

In Weber Electric Co. v. Wirt Mfg. Co., 226 Fed. 481, in the United States District Court of the District of Massachusetts, a suit on the same patent, the socket casing found to infringe claim 4 had no transverse slit bounding the abrupt terminations of the projections. True, in that case, the evidence taken on behalf of the defendant was not considered, as the defendant did not appear on final hearing; but no infringement could have been found if claim 4 had been limited to the precise structure described. Such finding necessarily gave this claim the benefit of the doctrine of equivalents.

The defendant's structure has no transverse slit. Its projections are circular eyelets or studs formed by punching up the metal of the sleeve. These projections are not inclined toward the cap member; in fact, their axes lie at right angles to the axis of the sleeve, and in themselves furnish no aid, but rather a hindrance, to a movement of the cap over these projections. This hindrance, however, is overcome, and the movement of the cap over the projections accomplished, by flaring or inclining outwardly the flange of the cap immediately underneath the recesses designed to enclose the projections on the sleeve. With

a cap thus beveled the registering of the eyelets of the sleeve in the recesses in the cap, located immediately above such bevels, is easily done, and an automatic interlocking of cap and sleeve with a snap action takes place when these two members are telescopically applied to each other. The transfer of the bevel, and one of its functions, from the projections to the flange of the cap, where, by its engagement with the projections in telescopically assembling the members of the casing, it is to operate in the same manner, viz., to aid the movement of the cap over the projections, and to accomplish the same result, viz., the clutching of the projections by the recesses when the assembling is effected, is but a substitution of mechanical means designed and used to accomplish the results of those mentioned in the claim, and is to that extent an infringement of those means. While the defendant's projecting studs do not furnish as abrupt a termination as can be obtained by slitting the metal, their termination is sufficiently abrupt to effect a positive snap locking of cap and sleeve, releasable only by manually compressing the sleeve. The interlocking result achieved by the defendant's structure is identically that of the plaintiff's. The means employed for this purpose and the mode of their operation are similar to those of the plaintiff's structure, and, in my judgment, are but mechanical equivalents of the elements used in plaintiff's device and pointed out in claim 4, and embody and appropriate the idea or principle of the plaintiff's invention.

[3] True, the expression of this inventive idea in mechanical form is somewhat different in the defendant's structure. In forming the projections on the sleeve which are to register in the recesses in the cap, the defendant does not utilize a transverse slit, and no slit is used in producing the abrupt termination. Furthermore, the projections do not furnish an incline to permit the cap readily to pass over them; but merely changing the form or location of the mechanical elements does not avoid infringement, if such alterations are but different ways of mechanically expressing the dominant feature of the inventive idea, and achieve the same result in substantially the same way. Of the cases holding that a reversal or transfer of a part and its function from one element to another in a like combination will not avoid infringement, etc., see Devlin v. Paynter, 64 Fed. 398, 12 C. C. A. 188; Consolidated Fastener Co. v. Hays, 100 Fed. 984, 41 C. C. A. 142; Adam v. Folger, 120 Fed. 260, 56 C. C. A. 540; Wagner Typewriter Co. v. Wyckoff, Seamans & Benedict, 151 Fed. 585, 81 C. C. A. 129; Walker v. Giles (D. C.) 207 Fed. 825, affirmed 218 Fed. 637, —— C. C. A. ——.

Defendant's present effort to avoid infringement is as completely within the range of equivalents to which the plaintiff's structure is entitled, as was the Wirt device, and is as futile as was its earlier effort, which was declared to be an infringement in the causes before the Second circuit courts hereinbefore referred to, and must receive the like condemnation. As to defendant's Key Socket, No. 2, the plaintiff is entitled to the usual decree for injunction and accounting.

As to the defense of nominal damages only for infringement of "Complainant's Exhibit, Defendant's Key Socket," "Complainant's

Exhibit, Defendant's Keyless Socket, No. 1," and "Complainant's Exhibit, Defendant's Keyless Socket, No. 2," made the basis of the original bill:

The bill makes no allegation that the patented articles were marked or labeled as required by R. S. § 4900 (Comp. St. 1913, § 9446), but it does allege (paragraph 12) that the defendant was duly notified of its infringements of the letters patent in question, and that it nevertheless continued to infringe. The defendant's answer does not allege that the plaintiff had failed to mark or label its said patented articles, but it does deny the plaintiff's allegation in paragraph 12 of its bill relating to notice and continued infringement. The only proof bearing on this question is found in the written stipulation between the parties, made a part of the record, viz.:

"It is hereby stipulated that prior to the commencement of this action, and subsequently to April 23, 1909, the defendant herein made and sold, within the district of New Jersey, incandescent electric lamp sockets, the same in all respects as each of said plaintiff's exhibits herein. 'Defendant's Key Socket,' 'Defendant's Keyless Socket, No. 1,' and 'Defendant's Keyless Socket, No. 2,' and that said manufacture and sale of sockets the same as said 'Plaintiff's Exhibit, Defendant's Keyless Socket, No. 2,' was continued by the defendant after it had been notified of the said suits against said National Gas & Electric Fixture Company for the sale of incandescent electric lamp sockets made by Union Electric Company, and after it had undertaken the defense of said suits."

In these circumstances, in addition to an injunction, the plaintiff is entitled to an accounting of profits or damages as to all of the sockets made the basis of the original bill, as to "Key Socket" and "Keyless Socket, No. 1," only from the date of filing such bill, and as to "Keyless Socket, No. 2," from the date it undertook the defense of the suit referred to in such stipulation.