WAGNER TYPEWRITER CO. v. WYCKOFF, SEAMANS & BENEDICT.

(Circuit Court of Appeals, Second Circuit. January 8, 1907.)

No. 20.

1. PATENTS—CONSTRUCTION OF CLAIMS—IMPROVEMENT PATENT.

In construing improvement claims of a patent, consideration should be given to the character of the improvements introduced by the patentee and the change in the art attributable to them. When they result in converting imperfection into completeness, and in producing the first practically and commercially successful machine, however simple the change appears, the invention is entitled to liberal treatment by the courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 249.]

2. SAME—PRIMARY IMPROVEMENTS.

Courts look with favor upon patents for primary improvements which are novel and a manifest departure from the principles of prior structures, and which constitute the final step necessary to convert failure into success.

3. SAME.

A strict construction of the claims of a patent should not be resorted to, if the result would be a limitation on the actual invention, unless it is required by the language of the claim.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 241.]

4. SAME—INFRINGEMENT—CHANGE OF PARTS.

Infringement is not avoided by changes in a patented machine which are nonessential, as by changing the positions of parts or transferring a function from one part to another, without affecting the principle or mode of operation.

5. SAME—CONSTRUCTION OF PATENT FOR PRIMARY IMPROVEMENTS—TABULATING ATTACHMENT FOR TYPEWRITERS.

The Gathright patent, No. 436,916, for an improvement in typewriters, which consists of an automatic tabulating attachment, while not for a pioneer invention, covers a primary and valuable improvement on the

tabulators of the prior art, and the first practically and commercially successful tabulating device, and its claims are entitled to a construction sufficiently liberal and a range of equivalents sufficiently broad to protect the actual invention. As so construed, claims 4 and 5 *held* infringed.

6. SAME—INFRINGEMENT—SPECIFIC IMPROVEMENT CLAIMS.

A patent for a specific improvement on a prior machine is not infringed by a machine which does not contain such improvement, on the theory that an equivalent device is used.

7. SAME—INFRINGEMENT.

The Gathright patent, No. 452,268, for an improved tabulating attachment for typewriters construed, and *held* not infringed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 138 Fed. 108.

On appeal by the complainant from a decree of the Circuit Court for the Southern District of New York in favor of the defendant in a suit for infringement of two letters patent, granted to Josiah B. Gathright for improvements in typewriting machines. The first of these, No. 436,916, was granted September 23, 1890; the application being filed January 15, 1889. The second, No. 452,268, was granted May 12, 1891; the application being filed October 17, 1890.

A. von Briesen, for appellant.

Edmund Wetmore and H. D. Donnelly, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. This is an equity suit for the infringement of two letters patent, granted to Josiah B. Gathright, for improvements in type-writing machines.

### First Gathright Patent.

The first of these patents, No. 436,916, relates to improvements in that class of machines which are provided with feed racks for moving a carriage to space between the letters of each line.

The specification describes the improvement as embodied in a Remington machine. The patentee says that prior to his invention, when the operator desired to do tabulating work, it was necessary for him to advance the carriage by repeatedly striking a spacing key or by unlatching the carriage and sliding it to the desired point by means of a hand lever; both methods being tedious, irritating and perplexing. The patentee's object was to obviate these objections by providing means for automatically locating with the typewriter one or more columns of words or figures and mechanically skipping any intervening space desired to be left blank. The invention consists in the construction and combination of parts forming a portion of a typewriter designed to accomplish the objects stated.

The principal features of Gathright's invention are the following:

First, a supplemental spacing key which is exclusively devoted to the tabulating attachment and performs no function except in connection therewith. The operator, by pressing on this key disengages the detent, or feed-dog, from the rack, which is held disengaged until the carriage passes over the desired space, when the carriage is stopped by

the lateral arm of the feed bar, which is pivoted to the carriage, coming into contact with lugs adjustably but firmly fixed to the stop-rod. By releasing the key from pressure the stop-lug is removed from the usual path traveled by the carriage and the detent again engages with the toothed rack.

An independent key of this character has advantages over the keys of the prior art and particularly over a key adapted by light pressure to advance the carriage a single letter space and, by heavier pressure, to release it entirely. Such a key, as is pointed out by the patentee, is in continual danger of being over-pressed, unless the mind of the operator is constantly alert to prevent it.

A second feature is the lift-slide and stop-rod freely hung, adjustable longitudinally of the machine, and normally supported close beneath some cross portion, like the lateral arm of the feed rack referred to above. This rod is raised and lowered by the spacing key lever and connecting upright post on which the rod is seated. The rod is provided with lugs for stopping the carriage which may be adjusted, by set screws, at any desired point on the rod. When pressure on the key is released the rod returns to its normal position, the stopping shoulders of the lugs are removed out of the path of the carriage and the machine is free to resume its step-by-step action. The lever between the key and the vertical post, which connects the lever to the stop-rod, is pivoted to the frame of the machine and constitutes the mechanism for lifting the lugs into contact with the carriage arm and lowering them out of contact as the key is respectively pressed down or released.

Generally speaking, the patentee's contribution to the art consists in providing an independent mechanism operated by a separate spacing key by which adjustable stop-lugs can be brought into contact with a portion of the feed carriage, thus dispensing with the use of the small and comparatively delicate feed-dog, or detent, to bear the greatly increased strain when the carriage is released from the step-by-step movement. The drawings show the adjustable lugs attached to the stop-rod, but it is obvious that if, for any reason, it were desirable to transpose these parts so that the adjustable lugs are attached to the moving frame and the fixed abutment to the stop-rod, the change would not be a departure from the spirit of the invention. The two would be alternative and equivalent constructions.

The tabulating attachment is so constructed that it may be attached to or removed from the machine without interfering with its use as an effective typewriter. The patentee says:

"It would require only ordinary mechanical skill to adapt my stop-rod and lugs to any kind of a self-feeding typewriting machine by following out the principle of construction herein described. Therefore, I deem it unnecessary to illustrate its application to the great variety of typewriting machines which have been invented."

### The Claims.

The claims involved are as follows:

"(4) The combination of a stop-rod freely hung to the machine, a stop-lug thereon, and a supplemental spacing-key hung in the machine and adapted to move the said stop-lug into the path of a portion of the feed-carriage, and connection between the stop-rod and rack-bar, substantially as shown and described.

· "(5) In a typewriter, the combination of the usual letter-keys and one or more spacing-keys having mechanism in common for permitting the carriage to move a definite space at each stroke, and a supplemental spacing or skipping key fitted to permit the carriage to move any desired number of said spaces, according to adjustment, said key provided with independent mechanism for releasing the carriage from the detent, and mechanism for simultaneously interposing an adjustable stop, substantially as shown and described."

## Contention of the Parties.

The complainant contends that Gathright was the first to construct a commercially operative tabulator, that the patent is a pioneer and that these claims are entitled to a broad range of equivalents.

The patentee's own views on this subject are stated in the specification as follows:

. "Because of the necessary changes in details of construction that would naturally result from the adaptation of my invention to different styles of typewriting machines, I do not wish to confine my claims to the specific device herein described."

The defendant disputes this contention and insists that if a construction broad enough to include its tabulator is placed upon the claims they are anticipated by prior patents and structures. If, however, the claims are confined to the improvements contributed by Gathright they are not infringed.

## Second Gathright Patent.

The second patent, No. 452,268, was granted to Gathright,. May 12, 1891, and is for an improvement upon the mechanism of the first patent whereby the skipping device of No. 436,916 may be adapted to fit type-writing machines of different kinds, the Caligraph and the Remington being among them. The Remington No. 2 machine is the one described in the specification.

The principal feature ·introduced consists of a rock-shaft mounted on the frame of the machine along which shaft the stop-lugs may be adjustably located, or they may be located on the carriage, so that when the shaft is rocked on its axis the lugs will come into the same path of travel as the carriage and. stop the latter by being brought into contact with some part thereof, adjustable or fixed, when the latter is released by the removal of the detent from the feed-rack. In other words, the improvement seems to consist in the substitution of rock-shaft 16 for the stop-rod 14 of the first patent. The latter being freely mounted with a rocking axis at right angles to the path of travel of the carriage and the former being mounted on an axis parallel to the path of travel, the stops being adapted to engage the carriage by being rocked into its path instead of being lifted into contact as in the first patent. As before stated it· is, of course,· immaterial whether the adjustable stops are on the rod and the fixed stop on the carriage or vice versa.

The difference between the devices of the two patents is clearly pointed out by the complainant's expert, Mr. Fraser, as follows:

·' "In the Gathright second patent the part which corresponds in function to ·the stop rod 14 of the first patent, is a rock-shaft which is extended approxi-·mately.·parallel with the travel of the carriage, or in other words with the ·feed-rack. · The axis.around which·this shaft turns.or oscillates is consequently at right angles to that around which the stop rod 14 of the first.patent

vibrates. In the case of the construction shown in Figs. IV. and VI. where the only part upon the rock-shaft which has any action upon the feed-rack or any co-action with the adjustable stops is the cam or arm 45, this second invention involves that this arm or cam shall swing through a vertical plane developed from front to rear, or in other words, perpendicular to the movement of the carriage; whereas the specific construction shown in the first patent involved that the active part, namely, the stop rod 14, should swing in a vertical plane developed from the left to right, or in other words, parallel to the movement of the carriage."

## The Claims.

The claims involved are as follows:

"(6) The combination, in a type-writing machine having a carriage feed-rack, of a detent hung to engage the said rack, a rock-shaft journaled in bearings parallel with the feed-rack to be rocked in a direction transverse thereto and having one arm communicating with the said detent to disengage it from the rack and another arm or block to be rocked into the path of a fixture of the carriage, and a skipping-key connected with the rock-shaft, substantially as described.

"(8) The combination of a type-writing machine feed-rack, a rock-shaft nearly parallel with the rack wholly independent of the ordinary feed rock-shaft, a lug upon one and stop-blocks adjustably secured upon the other, a detent for the rack, the rock-shaft having one arm to disengage the rack and detent, and another arm connected with a skipping-key, substantially as described."

## Defenses.

The defenses are the same as those interposed to the first patent, viz., anticipation of the claims if broadly construed, and noninfringement if confined to the improvements contributed by Gathright.

## Gathright Not a Pioneer.

The contention that Gathright is entitled to the rewards of a pioneer inventor cannot be maintained. If we may be permitted a metaphor, he did not discover the new mine, he reached it by following trails blazed by others through the wilderness; but once arrived, by his genius and energy, he converted a nonproducing failure into a busy, prosperous and lucrative enterprise. In other words, he developed the mine. Gathright's first application was filed January 15, 1889. In an affidavit, verified July 3, 1890, and filed in the Patent Office, July 5, 1890, he avers that he conceived the invention "on or about the 28th day of December, 1887; that about the 2nd day of January, 1888, and after, he made frequent sketches of the invention at issue by which to explain it to others; that he first explained the invention to others on or about the 2nd day of January, 1888."

Assuming this statement to be competent proof and giving to it the most liberal construction it is manifest that the earliest possible date which can be assigned him is December 28, 1887.

## Prior Art.

Long prior to this Schulte, McCormack, Yost and others not only had conceived the broad idea of an automatic tabulating attachment but had fully described operative mechanism for carrying it out. In the action of the American Writing Machine Company against this complainant we have reviewed at length the old art and particularly the contributions thereto of Yost and Schulte. It is wholly immaterial to

the present issue which of these two was the prior inventor, for both were long prior to Gathright.

Reference may be had to the opinion in the other case for the details of the Yost and Schulte devices, rendering an extended discussion of them here unnecessary. Suffice it to say that as early as September 3, 1880, Yost had constructed a model showing, in a type-writing machine, the combination with a movable carriage of an adjustable stop, a dog, or detent, to engage the same and a key to disengage the dog from the feed-rack and bring it into contact with the adjustable stop. About the same time Yost made, or had made, other machines embodying substantially the same construction as shown in the model which were actually used for tabulating purposes.

Schulte, prior to July 22, 1886, the date of his application, had conceived the combination, fully described in his patent, which produced an operative but not a particularly efficient tabulator.

The McCormack patent, the application being filed June 17, 1886, shows substantially the same construction as the Schulte patent, except that McCormack employs a separate key for tabulating.

It is too plain for argument that Gathright cannot be treated as the first to construct an automatic tabulating device for use in type-writing machines. He must, therefore, be confined to the improvements upon existing devices which he has made. The broad conception was not his and he can only treat as infringers those who use his device or one which may fairly be treated as an equivalent.

### Gathright Made First Commercially Successful Tabulator.

On the other hand, in construing the claims consideration should be given to the character of the improvements introduced by Gathright and the change in the art which is attributable to them. Though we are not prepared to say that the prior tabulators were abandoned failures we are fully convinced that the evidence establishes the proposition that they were not commercially successful and never could be made successful so long as the feed-dog was utilized to receive the entire shock of the spring-propelled carriage.

Each of the prior machines had a doubtful and more or less checkered existence. After being battered and worn beyond the help of the repairer they finally disappeared as tabulators when the new type embodying the Gathright improvements began to make its appearance. In short, we are constrained to say that to Gathright belongs the credit of constructing the first commercially successful tabulator. The changes introduced by him seem simple and obvious in the light of the present but it is a significant fact that all the prior inventors, Schulte, McCormack and Yost used the feed-dog to stop the carriage and it never seems to have occurred to any one before Gathright to make the tabulating apparatus wholly independent of the writing machine proper. Gathright's device, though an improvement upon the existing tabulators, was an improvement of such vital importance that it may be said that the art, when considered from a practical and commercial point of view, began with him. He converted a theory into a fact. His invention belongs to that large class which have ever been treated with liberality by the courts, where the inventor by an apparently simple

change, addition or transposition of parts, has converted imperfection into completeness.

## The Law Relating to Primary Improvements.

The language of the Supreme Court in Westinghouse v. Boyden Co., 170 U. S. 537, 572, 18 Sup. Ct. 707, 42 L. Ed. 1136, seems applicable.

"We are induced to look with more favor upon this device, not only because it is a novel one and a manifest departure from the principles of the Westinghouse patent, but because it solved at once and in the simplest manner the problem of quick action, whereas the Westinghouse patent did not prove to be a success until certain additional members had been incorporated into it. * * * If credit be due to Mr. Westinghouse for having invented the function, Mr. Boyden has certainly exhibited great ingenuity in the discovery of a new and more perfect method of performing such function."

In The Barbed Wire Patent, 143 U. S. 275, at page 282, 12 Sup. Ct. 443, at page 416 (36 L. Ed. 154), the court says:

"The difference between the Kelly fence and the Glidden fence is not a radical one, but slight as it may seem to be it was apparently this which made the barbed-wire fence a practical and commercial success. * * * Under these circumstances courts have not been reluctant to sustain a patent to the man who has taken the final step which has turned a failure into a success."

In Consolidated Valve Company v. Crosby Valve Co., 113 U. S. 157, at page 179, 5 Sup. Ct. 513, at page 525 (28 L. Ed. 939), the court says:

"Richardson's invention brought to success what prior inventors had essayed and partly accomplished. He used some things which had been used before, but he added just that which was necessary to make the whole a practically valuable and economical apparatus."

See, also, Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658.

## Construction of Claims.

That the claims of the first patent are entitled to the broadest range of equivalents cannot be successfully maintained, but we think they are entitled to liberal interpretation and cannot be evaded by one who uses the elements of the combination, or equivalents therefor, which a mechanic of ordinary intelligence would have wit enough to adopt if asked to substitute for the rods, lugs and keys of the patent other elements to which, though differing markedly in appearance, accomplish the same result in substantially the same way. The claim should be as broad as the invention.

A safe and conservative rule for the construction of such claims is clearly stated by Judge Shipman in Smead Co. v. Fuller & Warren Co., 57 Fed. 626, 6 C. C. A. 481, as follows:

"The actual invention, if in conformity with the language of the claims, should control in the construction of patents. A strict construction should not be resorted to if it becomes a limitation upon the actual invention, unless such construction is required by the claim, it being understood that the construction should not go beyond and enlarge the limitations of the claim."

In Machine Co. v. Murphy, 97 U. S. 120, at page 125, 24 L. Ed. 935, the court says, that in determining the question of infringement the court is—

"to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result; always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result."

See, also, Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Eldred v. Kirkland, 130 Fed. 342, 64 C. C. A. 588; Reece Buttonhole Co. v. Globe Co., 61 Fed. 959, 10 C. C. A. 194.

## Claims of Second Patent Limited.

Of course the foregoing observations are inapplicable to the second Gathright patent, which, by the obvious requirements of the prior art and by the express concessions of the specification itself, is limited to improvements upon the structure of the first patent.

A licensee under the first patent who uses the mechanism therein described and claimed cannot be held as an infringer under the second patent. In order to hold him it is necessary to show that he uses the devices of the first patent plus the improvements of the second patent; not any and all improvements calculated to produce similar results, but the precise improvements described and claimed.

## Elements Stated.

Claim 4 of the first patent is for a combination, containing the following elements:

First. A stop-rod freely hung to the machine.

Second. A stop-lug on the rod.

Third. A supplemental spacing-key hung in the machine and adapted to move the said stop-lug into the path of a portion of the feed-carriage.

Fourth. Connection between the stop-rod and rack-bar.

The combination of the fifth claim has the following elements:

First. The usual letter-keys and one or more spacing-keys having mechanism in common for permitting the carriage to move a definite space at each stroke.

Second. A supplemental spacing or skipping-key fitted to permit the carriage to move any desired number of spaces according to adjustment.

Third. Said key provided with independent mechanism for releasing the carriage from the detent.

Fourth. Mechanism for simultaneously interposing an adjustable stop.

Of course, the combinations in controversy are expressly stated to be in type-writing machines.

## Infringing Device.

The infringing device is known as the Gorin tabulator and is fully described in circulars issued by the defendant. It is a complicated structure containing many parts which it is not necessary to describe in detail.

This device as shown in the Remington typewriter (No. 6) alleged to infringe, employs eight skipping keys, instead of one. These keys are arranged below the bank of printing keys and are mounted on push

rods. When one of the keys is pressed inwardly it vibrates a vertical lever hung in the rear of the machine, the upper end of the lever having a pin connection with a sliding dog, or stop-lug, which is moved by the lever into the path of an adjustable stop on a bar attached to the carriage and moving with it. At the same time and by the same movement the plate which extends under the rack is raised so as to disengage the members of the feeding mechanism and permit the carriage to travel to the desired point for tabulating where it is stopped by the two abutting shoulders coming into contact. When pressure is removed from the key it is forced back by a spring action and the ordinary step-by-step printing may be resumed.

The question of infringement should be considered from the view point of a single spacing key; the addition of seven other spacing keys in no way affects the question. If one key and its connecting train of mechanism infringes it is sufficient. Speaking generally, it can hardly be denied that the defendant employs an independent tabulator which can be attached to or removed from an ordinary typewriter without affecting its normal operation of writing; or that the defendant uses an independent or supplemental spacing-key and, by means of a train of mechanism set in motion by this key, lifts the rack from connection with the feed-dogs and stops the carriage at the desired point by bringing an abutting shoulder carried on the carriage frame against an abutting shoulder carried on a stop-rod, or lever, freely hung in the machine.

That the defendant's spacing key is the substantial equivalent of the key of the patent is apparent and that the defendant's lever is the equivalent of the pivoted stop-rod 14 of the patent can hardly be disputed in view of the identity of function which evidently exists and which is frankly and clearly pointed out by the defendant's expert, Mr. Newberry. He says:

"The only difference between the simple lever, 8-G of defendant's machine, and the simple lever, stop-rod 14 of the Gathright first patent, is that in defendant's machine, the fulcrum is between the ends of the lever, while in the stop-rod 14 the power is between the ends of the lever instead. Each is a simple lever, and that is all there is of it."

The sliding dog at the upper end of this lever is the stop-lug thereon and the spacing-key, by pressing outwardly the lower end of the lever, throws the stop inwardly into the path of a projection on the feed carriage. Connection between the lever and the rack-bar is effected by a simple arrangement of arms, links and levers by which the rack is lifted from communication with the detent or escapement.

We have then all the elements of the fourth claim or plain equivalents therefor, with such obvious changes as a mechanic would adopt if asked to adjust the device of the patent to the improved machine.

The defendant seeks to read into the claim adjustability as a feature of the stop-lug on the rod. Two answers at once suggest themselves. First, the claim is silent on the subject; and, second, if the claim contained as its second element "an adjustable stop-lug on the rod," infringement would not be avoided by placing the adjustable lug on the carriage. The location of the lug is not of the essence of the

151 F.—38

invention and it is manifestly immaterial and a mere matter of convenience whether the adjustable lug is on the rod or carriage.

Few patents would be safe if their claims could be avoided by a change of parts so obvious and so unimportant. In the action on the Schulte patent the defendant was fully in accord with this view, for it was said by its expert:

"So long as one of these members of this stop mechanism is made adjustable, the carriage can be stopped at any desired point in its path of travel, and it is wholly immaterial, in my opinion, in view of the position that Schulte occupies in the typewriter art, which one of these members is made adjustable."

In the Buttonhole Case, supra, the court, speaking of a similar contention, says:

"As the principle of the patentee's stitching mechanism is clearly such that the relative movements between it and the plate are essential while the absolute movements—that is, whether the plate moves or the frame moves—are nonessential, the proposition of the defense, if maintained, destroys, through the phraseology of the application and claims touching matters thus nonessential, the entire value of this important, useful, and hitherto profitable invention."

The usual letter-keys and one or more spacing-keys of the fifth claim are the ordinary keys actuating the universal bar found in all writing machines and are, of course, in the defendant's machine. The supplemental-key of the defendant's tabulator is the one we have just described, the independent mechanism for releasing the carriage being the horizontal push-rod, vertical lever and connecting parts by which the rack is lifted from the detent, and the mechanism for interposing an adjustable stop is that by which the sliding dog, or stop-lug, is placed in the path of projections on the carriage.

## Claims of Second Gathright Patent.

The sixth claim of the second patent is for a combination of the following elements:

First. A detent hung to engage the carriage feed-rack.

Second. A rock-shaft journaled in bearings parallel with the feed-rack to be rocked in a direction transverse thereto and having one arm communicating with the said detent to disengage it from the rack and another arm to be rocked into the path of a fixture of the carriage.

Third. A skipping-key connected with the rock-shaft.

The eighth claim of the second patent is for a combination containing the following elements:

First. A feed-rack.

Second. A rock-shaft nearly parallel with the rack wholly independent of the ordinary feed rock-shaft.

Third. A lug upon one and stop-blocks adjustably secured upon the other.

Fourth. A detent for the rack.

Fifth. The rock-shaft having one arm to disengage the rack and detent and another arm connected with a skipping-key.

As before stated the distinguishing feature of the second patent is the substitution of a rock-shaft for the pivoted stop-rod of the first patent so that the lugs are rocked instead of being lifted into the path of the carriage.

It is unnecessary to enter upon an elaborate discussion of the question of infringement of these claims, for the reason that each has as an element a rock-shaft. In the sixth claim it is "a rock-shaft journaled in bearings parallel with the feed-rack to be rocked in a direction transverse thereto." In the eighth claim it is "a rock-shaft nearly parallel with the rack wholly independent of the ordinary feed rock-shaft."

There is no such rock-shaft in the defendant's tabulator.

Infringement is predicated of the assumption that the simple lever of the defendant's device, which we have already held to be the equivalent of the stop-rod lever of the first patent, is the rock-shaft of the second patent or an equivalent therefor.

This assumption is based upon an ingenious argument of the complainant's expert, where, by a process of exclusion and transposition, aided by a vivid imagination, he transforms the swinging pivoted lever of the machine into the rock-shaft of the patent. In other words, the argument amounts to an attempt to show that a rock-shaft might be substituted for the lever in defendant's machine.

Such an argument would hardly be permissible were we concerned with a broad, fundamental patent, but in a patent strictly limited to a specific construction it is wholly irrelevant. Gathright obtained his second patent because he convinced the Patent Office Officials that he had made an improvement on the mechanism of the first patent; and we are now asked to hold as an infringer one who does not use the improvement. This cannot be done.

It follows that the decree is affirmed as to the second Gathright patent and reversed as to the first without costs of this court, and the cause is remanded to the Circuit Court with instructions to enter a decree in conformity with this opinion, without costs.