### WALKER et al. v. GILES et al.

#### (District Court, N. D. New York. September 6, 1913.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ICE CREAM DIPPER.

The Olmstead patent, No. 819,373, for an ice cream dipper, *held* valid as against the claim of prior invention by another, and not so limited by the proceedings in the Patent Office, or by the language of claim 1, which calls for a peripheral flange on the toothed scraper hub, normally preventing such hub from falling out when the dipper is inverted, that infringement is avoided by the device of the Nielsen patent, No. 833,620, in which such flange is merely transferred to the gear rack, which is the co-operating element; the principle and mode of operation and the result accomplished remaining the same.

2. PATENTS (§ 310*) — SUIT FOR INFRINGEMENT — AMENDMENT OF ANSWER — LACHES.

An amendment to the answer in an infringement suit to plead the defense of champerty will not be allowed on final hearing, where the evidence on which such defense is based was known to defendant two years or more before.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 507-540; Dec. Dig. § 310.*]

In Equity. Suit by Edwin Walker, John W. Dorman, Edward J. Dorman, and Mary L. Rexford against Henry Giles and Catherine Nielsen, copartners trading as Giles & Nielsen Nickel Works. On final hearing. Decree for complainants.

James H. Griffin, of New York City, and Frank C. Curtis, of Troy, N. Y., for complainants.

Fred Gerlach, of Chicago, Ill. (Lester W. Bloch, of Albany, N. Y., of counsel), for defendants.

RAY, District Judge. [1] The patent in suit alleged to be infringed was issued to Albert P. Olmstead, assignor to Lazelle A. Michael, trustee, May 1, 1906, on application filed December 30, 1905, for "ice cream dipper." The claim alleged to be infringed reads as follows:

"1. A dipper for plastic material, comprising in combination a handle and bowl provided with a hub bearing at the inner end of, and open to, the bowl;

a toothed scraper hub rotatively mounted in said hub bearing, and insertable and removable through the bowl, said hub having a peripheral flange overhanging on the inner side the teeth thereon; a scraper fixed upon said hub; and a hand lever mounted upon the handle and having a gear rack engageable with the teeth on the hub on the outer side of said overhanging flange."

It is a dipper for any kind of plastic material, but especially ice cream, and has in combination (1) a handle and bowl; (2) the bowl as a mere bowl is flaring and of greatest diameter at the top, and is provided with a hub bearing at the inner or lower end of the bowl, and open to the bowl; (3) a toothed scraper hub, with a scraper fixed on such scraper hub, and which hub is rotatively mounted in such hub bearing and insertable and removable through the bowl—that is, you pick it out at will or drop it out by releasing the gear rack; (4) this toothed hub has a peripheral flange which overhangs, on the inner side, the teeth on the hub; (5) a hand lever mounted on the handle, and which hand lever has (6) a gear rack engageable with the teeth on the hub on the outer side of such overhanging flange.

The bowl holds the ice cream or other substance. The hub bearing open to the bowl simply carries the scraper hub. The scraper hub, which is made to revolve, carrying with it the scraper next the inner surface of the bowl, is toothed to engage with the teeth of the gear rack, operated by the lever attached to the handle, and by pressing on which lever the rack, and consequently the hub, and hence the scraper, are made to revolve. A spring attached to the lever causes a resumption of the parts to their normal situation after being pressed by finger or thumb to remove the ice cream; that is, cut it out from the bowl. This scraper hub would be constantly falling out when the dipper is in use, but for some *means* to keep it in position. This means is the peripheral flange, which is a part of the hub, and overhangs on the inner side the teeth on the hub. Its function is to prevent the scraper hub, and consequently the scraper, from falling out until released for cleansing purposes.

The defendants' structure is a substantial duplication, with mere changes of form, or the substitution of well-known equivalents, until we come to this scraper hub and gear rack, which engages with the teeth on the hub. Defendant has no flange on the hub, but does have one on the gear rack, which, projecting above the teeth on the gear rack, also projects itself above the teeth on the hub when the parts are in normal position, and so effectually prevents the toothed scraper hub from falling out when the dipper is being used; that is, the flange is transferred from *hub* to the gear rack a mere transposition of the flange from one element of the device to another—a mere change of location, without a change of mode of operation, or principle of operation, or results. No element is added and no element is left out. The one device works as well as the other and accomplishes the same result, both working on the same principle and in obedience to the same laws.

This is a clear case of infringement, if complainants' patent is valid, that is, if Olmstead was the first inventor of this patented device, unless the complainants are estopped by the action of the Patent Office

and acceptance of its action to claim that their patent covers this changed construction, that is, are limited to the precise construction claimed, to wit. a peripheral flange *on the hub itself* to perform the function mentioned. The language of the claim is:

"Said hub having a peripheral flange overhanging on the inner side the teeth thereon."

If the flange, whose function it is to prevent the scraper hub from falling out, *must be attached to and form a part of such hub*, defendants do not infringe, as it cannot be claimed that defendants have any *such flange performing any such function*, or an equivalent, attached to and forming a part of the scraper hub of their ice cream disher. If, however, the mere transfer of this flange, which is a part of the element "toothed scraper hub" in complainants' patent and the claim thereof in issue, and also of the same element in defendants' device, to the adjoining and co-operating element found in both structures or devices, viz., "gear rack engageable with the teeth on the hub," this gear rack being thereby made to perform the added function or work of carrying or supporting the flange, is a mere change of location of the part of an element without changing the mode of operation or the result, and complainants are not *estopped* to claim that the claim in issue (claim 1 of the patent in suit) covers such a structure or device, then there is infringement. Here is no leaving out of an element, and no change of the mere form of an element, so as to make one element in one structure perform the functions of two elements in the other structure.

If Olmstead was the first to employ the gear rack as the means for holding in its place the hub or pinion and attached scraper in such a way as to permit the ready removal thereof through the bowl on releasing such gear rack from its engagement therewith, then he was in a sense and to an extent a pioneer. for the great value and utility of the device must be conceded. The dangers to human life lurking in vessels which have contained and are to contain ice cream for consumption are everywhere recognized, and hence the necessity for appliances of this character which can be easily and readily disengaged or separated into parts for cleansing. If Olmstead held this position in this art. he is entitled to quite a broad range of equivalents, unless he has restrictions in the language of his claim either self-imposed or imposed by the action of the Patent Office and his acceptance of a narrow and limited claim in this regard.

## Patent Office Restrictions.

Claim 2 of the original application for the Olmstead patent, which on the issue of the patent became claim 1 thereof, the claim now in issue, originally read as follows:

"A dipper for plastic material, comprising in combination a handle and bowl provided with a hub bearing at the inner end of the bowl; a toothed scraper hub rotatively mounted in said hub bearing, said hub having a peripheral flange overhanging the teeth thereon; a scraper fixed upon said hub; and a hand lever mounted upon the handle and having a gear rack engageable with the teeth on the hub beneath said overhanging flange."

There was also a claim 4, and these were rejected in this language and for this reason:

"In claims 2 and 4 the *utility* of the flange is not made apparent as the matter is stated, and the claims are accordingly rejected."

This action was taken February 10, 1906, and February 20, 1906, the claimant proposed the following amendments, viz.:

"Claim 2, line 3, immediately after 'of' insert '*and open to.*' Same claim, line 4, immediately after 'hub bearing' insert '*and insertable and removable through the bowl.*' Same claim, line 5, immediately after 'overhanging' insert 'on the inner side.' Same claim, line 7, erase 'beneath' and substitute 'on the outer side of.'"

These amendments were allowed, and, March 20, 1906, Olmstead was notified that the claim was allowed. No suggestion was made that the claim was too broad, and nothing was cited against the claim, and there was no suggestion that patentable invention was not disclosed. It is readily seen that these amendments brought out clearly and made perfectly plain the "utility of the flange." The objection made by the Patent Office and the amendments made to meet such objection in no way suggest that the claimant is to be confined strictly to a structure where the "peripheral flange" is actually attached to and made to form a part of the "toothed scraper hub," and thus open the door to easy infringement by merely changing the *location* of the flange, or its equivalent, whose sole function is to prevent the said hub from falling out when the dipper is turned bottom side up to release the contents of the bowl, or in handling. The action of the Patent Office and these amendments in no way restrict or limit the claim as originally made and filed.

The original application had this claim, claim 1, of the original application, viz.:

"1. A dipper for plastic material, comprising in combination a handle and bowl provided with a hub bearing at the inner end of the bowl, said bearing being formed with a lateral opening; a toothed scraper hub rotatively mounted in said hub bearing; a scraper fixed upon said hub; and a hand lever mounted upon the handle and having a gear rack engageable with said toothed hub through the lateral opening in said bearing."

It was rejected on Bolland, No. 714,440, November 25, 1902, and canceled. It will be noted that this claim made no reference whatever to a flange or any device for preventing the "toothed scraper hub" from falling out. That claim and its rejection and cancellation has no bearing whatever on this controversy.

### Alleged Prior Use, etc.

As stated, Olmstead filed his application December 30, 1905, and his patent was issued May 1, 1906. February 26, 1906, Rasmus Nielsen filed an application for a patent for "ice cream spoon," No. 833,620, which was granted October 16, 1906. The alleged infringing device or spoon is made in very close imitation of and substantially according to the claims, one or more of them, of this Nielsen patent, which was issued to Catherine Nielsen and Henry S. Giles, assignees. That patent, which for brevity may be referred to as the Nielsen patent,

has nine claims, all of which may be valid claims for improvements in this art and still infringe the Olmstead patent in suit. Claims 1, 2, 3, 4, 6, and 7 of this Nielsen patent read as follows:

"1. In an ice cream spoon, the combination with a handle and a bowl of a finger operating in the bowl and formed with an extension, a finger-operating handle, means on a finger-operating handle co-operating with the finger extension for holding the finger in operative position, and adjustable means for permitting of the disengagement of the former means for the removal of the finger.

"2. In an ice cream spoon, the combination with a handle and a bowl of fingers in the bowl and having a gear wheel thereon, a finger-operating handle formed with teeth and a flange, said teeth engaging the gear and the flange holding the fingers in position in the bowl, means for limiting the movement of the operating handle in one direction, means for limiting the movement of said handle in the opposite direction, said latter means being adjustable to permit separation of the fingers from the bowl.

"3. In an ice cream spoon, the combination, with a handle and a bowl, of fingers in the bowl, a gear on the fingers, a finger-operating handle having teeth and a flange, said teeth engaging the gear, and the flange retaining the fingers in position by engaging with the gear.

"4. In an ice cream spoon, the combination, with a handle and a bowl, of fingers in the bowl, a finger-operating handle, means between the finger-operating handle and fingers for holding the fingers in position, and removable means for permitting movement of the finger-operating handle for disengagement of the fingers from the bowl. * * *

"6. In an ice cream spoon, the combination, with a main handle and a bowl, of fingers operating in the bowl, a gear operating in conjunction with the fingers, a finger-operating handle pivotally mounted on the main handle, teeth on the finger-operating handle, said teeth engaging with the gear, a lug adjacent the teeth to limit the movement of the finger-operating handle in one direction, a flange between the end of the finger-operating handle and the fingers to hold the fingers in operative position, a spring on the finger-operating handle for normally positioning the lug to limit the movement of said finger-operating handle, and an adjustable element in the path of movement of the finger-operating handle to limit its movement in the opposite direction, said element when adjusted permitting removal of the fingers from the bowl.

"7. In an ice cream spoon, the combination, with a handle and a bowl, of fingers in the bowl, a finger-operating handle, means between the finger-operating handle and spoon for transmitting rotary motion to the fingers, means for retaining the fingers and finger-operating handle in operative relation, and a set screw which limits the movement of the finger-operating handle in one direction, said set-screw adapted to be adjusted to permit disengagement of the fingers from the bowl and the finger-operating handle."

It is self-evident from a reading of these claims that Nielsen has transferred the *flange,* which holds from falling out of the spoon what he calls "fingers" and what Olmstead calls "scraper," and also holds the gear on the fingers, that is, the "toothed scraper hub," to his "finger-operating handle having teeth" at the end where it engages the fingers or their gear, and he locates this flange just above the teeth of the handle, and, as the cogs or teeth of his gear carrying the fingers are below or above (depending on whether the spoon is held mouth up or mouth down) this flange fixed to the end of the handle, or more properly the end of the lever attached to the handle, such gear carrying the fingers cannot fall out.

In Olmstead, with a flange on the scraper hub itself, such hub carrying the fingers, or scraper, cannot get by the teeth of the gear rack

connected to the hand lever mounted on the handle until the teeth of the hub are disengaged from the teeth of the hand lever mounted on the handle.

May 17, 1906, this Nielsen application was, it seems, examined and its allowance recommended without any reference to the prior art, or to the Olmstead application then pending, and John Imirie, Nielsen's attorney, was notified of such fact. On the same day, May 17, 1906, said Nielsen was also notified that:

"Your application for patent for an improvement in ice cream spoons, serial No. 303,071, allowed May 17, 1906, has been withdrawn from the issue files of this office. The reason therefor will be communicated to you by the examiner. Until a new notice of allowance is sent you, the final fee will not be required.
"Very respectfully,                    F. I. Allen, Com. of Patents."

May 19, 1906, two days later, the examiner, Stauffer, requested the Commissioner that the case be withdrawn from issue "for the purpose of citing *a recently patented reference.*" This was *approved* by the Assistant Commissioner the same day and the case withdrawn. May 22, 1906, Nielsen, through his attorney, residing at Washington, D. C., was notified:

"This application has been withdrawn from issue for the purpose of citing the following recently issued patent against claim 4, upon which said claim is rejected: Olmstead No. 819,373, May 1, 1906 (107—48).
"Chas. C. Stauffer, Examiner."

The *very next day,* May 23, 1906, evidently knowing what was coming, Rasmus Nielsen, at Troy, N. Y., made the following affidavit:—

"State of New York, County of Rensselaer.

"Rasmus Nielsen, being first duly sworn, deposes and says that he is the applicant of the above-entitled application for patent, and that prior to December 15, 1905, he made the invention described in the above-entitled application in the United States of America. The form of his invention as made prior to December 15, 1905, is shown in the spoon marked 'Exhibit A' herewith. Deponent further says that he does not know, and does not believe, that the subject-matter of the above-entitled application for patent has been in public use or on sale in this country, or patented or described in any printed publication in this or any foreign country, for more than two years prior to this application. Deponent further says that he has never abandoned the invention shown in the application, and disclosed by exhibit marked 'A.'
"Rasmus Nielsen.
"Sworn to and subscribed before me this 23 day of May, 1906.
"[Notarial Seal.]                           Charles Corliss."

This was filed June 1, 1906, with the following communication:

"Hon. Commissioner of Patents—Sir: In the above-entitled application applicant files herewith an affidavit and exhibit of his invention showing the completion of the same prior to December 15, 1905. The spoon filed as an exhibit is placed on record with the expressed understanding that it be returned.
"Respectfully,                               Rasmus Nielsen,
"By John Imirie, Attorney.
"June 1, 1906."

New claims 8 and 9 were added the same day, and the following communication filed:

"Hon. Commissioner of Patents—Sir: Please amend the above case as follows: Add the following claims: * * * The Olmstead reference having

been overcome by the affidavit filed herewith, it is respectfully requested that the application be passed to issue.

"Respectfully submitted, Rasmus Nielsen,
"By Jno. Imirie, Attorney.

"June 1, 1906."

June 8, 1906, the examiner called for information as to what was meant by "reinforcing band," whereupon June 11, 1906, the new or added claim 9 was amended, and June 14, 1906, the application was allowed, and the final fee having been paid September 27, 1906, the patent was issued October 16, 1906.

In view of these proceedings, and of this ex parte affidavit of Nielsen, *on which* the Nielsen patent was allowed and issued in the very face of the patent issued to Olmstead May 1, 1906, these Patent Office proceedings are of no value whatever, unless it be to raise the presumption that the Patent Office officials were of opinion that, in view of the patent to Olmstead, claim 4 at least of Nielsen's application, the broad claim, was not patentable. This, of course, is the natural conclusion. However, under the rules of the Patent Office, if a patent is granted to A. for an alleged invention, and B. also applies for a patent for the same thing after A. has filed his application, on B.'s application being held up, all he (B.) has to do is to make and file an ex parte affidavit that he made the invention at a date anterior to the date of the filing of A.'s application, and thereupon B. also has his patent, which usually is worded differently, of course. This, in substance, is what was done here, and, instead of there being an interference declared and fought out in the Patent Office, the controversy must be settled in the courts. As the claims of the one do not read literally on the claims of the other, perhaps no interference could have been declared. However, in this case, the presumption, which usually obtains in the case of two patents being issued to two different persons for what seems to be the same invention, that the Patent Office found a patentable difference, is lacking. The evidence shows that the Patent Office officials thought there was no patentable difference, but allowed the Nielsen patent to issue on the ex parte affidavit of Nielsen to the effect that he was the first inventor and had not abandoned his invention.

It has been many times said and held that that which infringes, if later, anticipates, if earlier. If the Nielsen spoon in question here was invented by Nielsen in the sense of the patent law prior to the time Olmstead made his invention, and such invention was not hidden and abandoned by Nielsen, it is quite clear that he does not infringe Olmstead. In fact, defendants do not deny infringement, assuming the validity of the Olmstead claim in issue, but allege and claim to have established prior knowledge and use by one Harry S. Geer, and that he disclosed the invention to Olmstead, and also prior knowledge or use by the said Rasmus Nielsen.

The defendants produce and put in evidence a disher, marked "Exhibit A, Rasmus Nielsen Application for Patent No. 303,071, Filed Feb. 26/06, Ice Cream Spoons," and which is also marked "Defendants' Exhibit, Nielsen Exhibit A." It is claimed that this is the spoon

referred to by Nielsen in his affidavit filed in the Patent Office and quoted above, and it is *now claimed* that Nielsen *made it* prior to December 15, 1905. If so, why did he not so state in his affidavit of May 23, 1906? Why did he say in that affidavit simply:

"That prior to December 15, 1905, he made the invention described in the above-entitled application [Olmstead's] in the United States of America. *The form of his invention* as made prior to December 15, 1905, is shown in the spoon marked 'Exhibit A,' herewith."

It is plain from all the evidence in the case that the spoon, "Exhibit A" above referred to, was made some time in the spring of 1906, to be filed in the Patent Office with the affidavit when the proper time should come, and was not made or in existence prior to December 15, 1905. Several facts indicate this; but clearly, if this Exhibit A had been made prior to December 15, 1905, Nielsen's affidavit *would have stated that fact.*

There is another dipper of the same general construction as to this flange, "Defendants' Exhibit, Nielsen Disher No. 1," which Rasmus Nielsen claims *to have made* in January or February, 1905, and he claims to have conceived it in January, 1905. He says he put it together, and "after my spoon was made" went to Henry C. Miller, in Waterford, N. Y., and showed it to Miller at Gates' factory, etc. He also presents "Defendants' Exhibit, Nielsen Disher No. 2," which he claims to have made thereafter; but this has no scrapers, or hub, or lever, or gear rack of any description. He claims these were taken out, and in part, at least, used in the construction of "Nielsen Exhibit A."

In his affidavit referred to, Nielsen did not state *when* he conceived his invention, and he now puts the date back of or prior to the time when it is shown *he knew* that Olmstead was making an ice cream disher on his own account, and, I think, *knew* that Olmstead had completed his invention. It is also clear that in the fall of 1905, Nielsen knew what Olmstead's invention was. If both were working on the same thing, or idea—that is, the production of a dipper of this form, cone-shaped, workable with one hand, and so arranged that the scrapers and toothed parts used to revolve them, thereby separating the contents of the bowl from the bowl itself, could be allowed to drop out easily by merely withdrawing the teeth on the lever, connected with the handle, from engagement with the teeth on the hub, and so arranged that such parts would *not* drop out until such withdrawal was made—the one who first perfected the invention and filed his application for a patent is entitled to the patent.

There are many facts which shake belief in Nielsen's statements, particularly as to dates. He is flatly contradicted in some important matters which go to his credibility. The excuse given for allowing Exhibit A to remain for months after its conception without action to secure a patent, without filing an application, is not satisfactory. Nielsen says that "Nielsen Exhibit A" is the one he made in August, 1905.

"Q. 50. After completing this Nielsen Disher 'A,' did you take any steps toward the manufacture of cone spoons? A. Yes, sir. Q. 51. State what you

next did in that respect. A. I inquired from different parties in regard *to what purposes they could be made for*, and what proportion (material, probably?) they could make them from. Q. 52. Please examine the letter I now hand you, and state whether you can identify it. A. Yes, sir; I called on that party and asked some questions in regard to making bowls. Q. 53. What kind of bowls? A. These were tin *cone* bowls. Q. 54. Please refer to this letter and state what you recall as having been done in connection with the manufacture of cone-shaped bowls and the time when it was done. A. It was about the latter part of October or November (1905) I called on John W. Wallace & Co., New York, asked if they would be in shape to build certain *cone* bowl that I required, which they state that they would take the matter up and confer with me later. This is the letter they sent me."

The letter was placed in evidence and was from John W. Wallace & Co. In attempted corroboration the cash book of Giles & Nielsen was produced to show the expenses of the trip, and then Nielsen testified:

"Q. Why did you go to the Wallace Company to see about *cone-shaped* bowls for dishers? A. As I was recommended to Wallace & Co. by a friend of mine, H. W. Fields. Q. 62. Did you understand that the Wallace Company was then engaged in making *cone-shaped bowls*? A. I was informed by Mr. Fields that Wallace & Co. was one of the largest concerns in the country manufacturing *cone dishers*."

He then produced and there was put in evidence "Defendants' Exhibit Tin Disher" as one of those then being made by Wallace & Co.

Edward C. Williams was in the employ of John W. Wallace & Co. in both 1905 and 1906. That firm was then engaged in the manufacture of ice cream cans and supplies and other sheet metal goods, including ice cream dishers, the "Wallace reparable disher," and was equipped for making them. That disher was manufactured under United States letters patent No. 803,906, granted November 7, 1905. That is a *cone-shaped* disher. Mr. Williams remembers the visit of this representative of Giles & Nielsen (Nielsen or Giles), and states that what that person wanted at that time was the *spoon bowls* of the "clipper dishing spoon" which are not cone-shaped, but a half round, and that for this half-round spoon he asked prices, and that he (Williams) wrote the letter of November 6, 1905, and that such letter refers by "spoon bowls" to these half-round spoons, and *not* to cone spoons which Wallace & Co. was making and fully equipped for making. He says "disher cups" refer to the cone-shaped dishers, and that the later letter, Defendants' Exhibit "Wallace Co. Letter of February 14, 1906," refers to the cone-shaped dishers. He says the difference was well known and recognized in the trade. In short, Mr. Williams testifies that in November, 1905, there was no reason why the firm could not have made prices on the cone-shaped dishers, but that there was reason why they could not make quotations on the "half-round" or the spoon-shaped bowl which Nielsen then wanted.

There is no reason for questioning the accuracy and reliability of this disinterested testimony of Mr. Williams, and it demonstrates that Nielsen was seriously in error, if not willfully so, in claiming that in the fall of 1905 he was trying to engage in making this cone-shaped disher, which he claims to have invented in January, 1905, and it is strong and persuasive evidence, in connection with other facts, that

207 F.—53

he did not make his cone-shaped dipper "A," and No. 1, and No. 2, referred to, until early in 1906, later than the date of invention fixed by Olmstead, and later than the filing of Olmstead's application. In the fall of 1905, Nielsen was working on the half-round disher and asking prices.

### Alleged Priority of Geer.

It is not necessary to take much time on this defense. There is no substantial evidence that Geer ever invented or had a conception of this device of Olmstead. He employed Olmstead to do some little mechanical work for him in connection with a dipper. He gave Olmstead $5 at one time and $3 at another. This work, which Olmstead, a mechanic, could do, and which Geer, a traveling agent, could not do, put the idea of an improved dipper into the brain of Olmstead, and except as to his family he worked secretly to accomplish this, and finally succeeded, and pursuant to an understanding with Geer sent his work to one Conant, offering, if Conant would furnish the money necessary to obtain a patent, to share the ownership or gains. This offer was declined. It is true that Geer wanted to get up a cone-shaped disher with removable scraper, and he so informed Olmstead; but he did not tell him how it could be done, and the work they did together failed to accomplish such result—that is, Geer's idea, whatever it was, resulted in failure. I do not see that Olmstead did anything underhanded, as he says, "I thought, if I completed it all right, I would do the right thing, take him in, and if I completed one he did that the pattern maker had, I would look for the same from him," and that he never refused to go on with the dipper Geer was having him work at. Olmstead also testifies, and I think truthfully:

"And as I told you before, he (Geer) said, if I could produce a good dipper, I think Mr. Conant would furnish the money, and Mr. Geer and I and all would have a hand in the matter."

This explains the sending of the completed work of Olmstead to Mr. Conant. It was only after Conant refused to furnish the money that Mr. Dorman was taken in by Olmstead, as he agreed to furnish the money.

It is claimed by the defendants that "Defendants' Exhibit, Geer Disher," which has the cone dish or receptacle, embodies the idea or invention of Geer, and that it has the toothed scraper hub (with scrapers attached), with an overhanging flange, and that this hub is mounted in the hub bearing of the bowl and operated by a hand lever, mounted on the handle, having a gear rack engageable with the teeth on the hub. In this structure of the "Geer disher" we have the cone dish or receptacle so formed at its apex as to furnish a bearing for the scraper and hub connected therewith, and this cone dish is mounted on the end of one-half the handle, which is divided into two parts hollowed out or recessed their whole length to receive the lever, spring, scraper hub, and gear rack. The scraper hub is just below the opening in the apex of the cone-shaped receptacle (as we hold the device with the mouth up), and there is a corresponding opening in the upper half of the handle, and is mounted in the other half of the handle furnished

with a bearing for the purpose. This scraper hub has a flange which prevents it from falling out through the cone-shaped receptacle when its teeth are engaged with the teeth of the gear rack on the end of the handle. This gear rack is formed of teeth on the side of a prolongation of the jointed lever, and works longitudinally with the handle, and not transversely thereto, as in the devices of Olmstead and Nielsen. The two halves of the handle are screwed together by screws holding all the parts in position. It is not difficult to assemble or disassemble; but it is heavy and somewhat cumbersome, and would be comparatively expensive.

In this structure, as it now exists, we have neither the structure of the Nielsen patent in question here, nor the structure of the Olmstead patent as a whole; but we do have the toothed scraper hub in part mounted in a bearing in the bowl, and which hub is provided with a flange overhanging the teeth thereon on the (so-called) inner side; and we do have a hand lever mounted on, or rather *in*, the handle, which lever has a gear rack (not of the same form as the others), engageable with the teeth on the hub on the *other* side of said flange. If Geer actually devised this structure, this toothed scraper hub with its flange and this gear rack, and had the idea of co-operation and engagement, and disclosed it to Olmstead, then Olmstead got his ideas (so far as the patentable conception is concerned) from Geer, and Geer was the inventor of all that is patentable in either Olmstead or Nielsen. But Mr. Olmstead, corroborated by several witnesses, denies that Geer had any such hub, etc., or combination, and denies that the structure was in any such form as now found when he worked on it, or when he turned over such parts as this had to Geer.

There was nothing new in toothed scraper hubs with hub bearings, with scrapers adjustably fixed thereon and connected with cone-shaped bowls, and engageable with and operated by a gear rack on the end of a hand lever mounted on the handle of the device; the toothed scraper hub being connected with the scraper, which had a bearing in the bowl, and which scraper was capable of being disconnected from its hub and was removable through the bowl, all the parts capable of being readily assembled and disassembled for cleansing purposes, or any other.

January 16, 1900, one Bach applied for a patent for "ice cream mold and dipper," which was granted April 9, 1901, No. 671,788. Bach has a cone-shaped dipper proper with an opening at the apex. The cone itself on its inner side forms a bearing for the rotatively mounted scraper thereon. This scraper is prolonged through the opening in the cone-shaped dish, and has, mounted thereon outside the apex of the receptacle, a toothed scraper hub, which hub is held in position by a nut. The handle proper is connected with this cone-shaped bowl at its apex. By removing the nut this toothed scraper hub is readily removed—in fact, will fall off—and then the scraper is removed through the bowl. The nut and bowl form bearings for this toothed scraper hub. To revolve the scraper a lever is attached to the handle of the disher or spoon by a screw on which the lever (forming a part of the handle) is pivoted. This lever has a gear rack engageable with

the teeth on this scraper hub. A spring is inserted between the handle proper and the lever, and by grasping in one hand the lever and handle and pressing them together the scraper is made to revolve. The nut on the prolongation of the scraper acts as a flange to prevent the hub from coming off and the scraper from falling out. Remove it, and scraper, toothed hub, and cone-shaped bowl are disassembled.

This structure, however, is not one where the scraper and scraper hub are integral, and which, on account of the flare of the scraper, must be removed, if removed at all, through the bowl. By enlarging the opening in the apex of the cone-shaped dish, this scraper hub would readily come out through the bowl; but it was means to prevent this when the disher was in use that was desired. The flange on the scraper hub occurred to some one, perhaps to both Geer and Olmstead, and it is sure that the idea of the reverse of this, or the flange on the end of the lever in connection with the gear rack occurred to some one. Adopt the flange on the hub, and the idea of the reverse construction would readily occur to any one. Given the one construction and there was no invention in producing the other. The lever carrying the gear rack was fixed to the handle and the handle was fixed to the bowl. It was only necessary to find some mechanical "contrivance" or structure which would retain the gear rack in place. I think it was Olmstead who first devised or invented means for doing this in such a combination. I have no doubt that Geer *desired* such means, but cannot find that he had any settled or well-considered idea of means, or that he devised such means. Undoubtedly he secured the services of Olmstead, hoping that he could and would find the means, and undoubtedly Olmstead did devise such means and for same he obtained his patent. He made the invention before Nielsen made his, if Nielsen made any, and the language of Olmstead's claim is not so narrow that a plainly equivalent construction does not infringe. If Nielsen is entitled to a patent at all, it must be on the ground that he was the first inventor of "the means" referred to.

It cannot be that valid patents can issue and be sustained for mere changes in form of construction or location of parts, or a portion of a part, without change in mode or principle of operation or result; for the mere transfer of a part of one element in a combination to another co-operating element by its side, the mode and principle of operation and result remaining precisely the same. I am not impressed with the argument or contention that Olmstead's invention is for one *species* of dipper, and Nielsen's for another species of the same genus as Olmstead's, and that each is patentable. In substance, aside from mere form, Olmstead and Nielsen are the same; the mode of operation, laws governing, and results obtained are the same—precisely the same. In both a projecting flange prevents the *scraper hub,* to which is attached the scraper, from falling out through the bowl of the dipper. In Olmstead this flange is on the hub, and hence the hub itself is obstructed in its outward movement when its flange meets the teeth on the engaged gear rack. In Nielsen the outward movement of the scraper hub is obstructed when its teeth meet the flange on the en-

gaged gear rack. In both cases the flange is the obstruction to the escape of the toothed hub. It is a matter of location merely.

This question of the limitation of claims by the language employed has been considered in hundreds of cases. It is not always easy to find a case in exact point. In Wagner T. Co. v. Wycoff S. & B., 151 Fed. 585, 81 C. C. A. 129 (2d Circuit), the court said:

"Infringement is not avoided by changes in a patented machine which are nonessential, as by changing the positions of parts, or transferring a function from one part to another, without affecting the principle or mode of operation."

In Benbow-Brammer Mfg. Co. v. Straus et al. (C. C. A. 2d Circuit) 166 Fed. 114, 92 C. C. A. 98, affirming (C. C.) 158 Fed. 627, the claim called for sleeve on the *operating* shaft moving up and down to produce a certain result. The infringing device had no such sleeve, but the up and down movement was secured on the same principle and by equivalent means placed on the *driving* shaft and consisting of a grooved hub, which on this shaft accomplished the same result as the sleeve on the operating shaft. The changes there were a much further departure from the language of the claims than the change made here.

## Alleged Champerty.

[2] Defendants on the final hearing presented a motion for leave to amend the answer and plead this defense of champerty. This cannot be permitted on the final hearing and after such delay. So soon as evidence was drawn out which tended to show champerty, if there be any such evidence, and this was done in October, 1910, if at all, it was incumbent on the defendants to move promptly and ask an amendment. To now delay the decision of the case and produce evidence on such an issue would be unfair and delay action. The motion should be denied on the ground of laches, if for no other reason. The motion to amend is therefore denied.

There will be a decree for the complainants, with costs.